TRANSCOM, INC., Plaintiff,

L & S Bearing Company,
Plaintiff–Intervenor,

v.

UNITED STATES, Defendant,

The Timken Company, Defendant–
Intervenor.

Slip Op. 98–42.
Court No. 97–01–00037.

United States Court
of International Trade.

April 7, 1998.

Neville Peterson & Williams, New York City (George W. Thompson and John M. Peterson), Washington, DC, for Transcom, Inc.

Frank W. Hunger, Asst. Atty. General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice (Lucius B. Lau); of counsel: Linda S. Chang, Office of Chief Counsel for Import Administration, U.S. Dept. of Commerce, Washington, DC, for Defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. Washington, DC, and Charles A. St. Charles) for Defendant–Intervenor Timken Co.

## OPINION

TSOUCALAS, Senior Judge.

Plaintiff moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the final determination of the Department of Commerce, International Trade Administration ("Commerce"), entitled *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results* "), 61 Fed. Reg. 65,527 (Dec. 13, 1996).

### Background

1. *Early Investigations and Reviews*

In 1986, Commerce conducted an investigation of tapered roller bearings ("TRBs") from the People's Republic of China ("PRC"). At that time, the only exporter of the subject merchandise known to the United States was a single national-level export corporation, China National Machinery and Equipment Import and Export Corporation ("CMEC"). *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value*, 52 Fed.Reg. 3833 (Feb. 6, 1987). All U.S. imports were sourced, either directly or indirectly, through Premier Bearing and Equipment, Limited ("Premier"), a Hong Kong trading company. Therefore, while only CMEC and Premier were named

in Commerce's preliminary determination, the investigation covered all PRC TRB sales to the United States. *Id.* at 3833–34.

In the final determination of the less-than-fair-value ("LTFV") investigation, Commerce found margins only for Premier, not for CMEC. *Tapered Roller Bearings From the People's Republic of China; Final Determination of Sales at Less Than Fair Value*, 52 Fed.Reg. 19,748 (May 27, 1987). The antidumping duty order therefore originally established rates only for Premier and "all others," the latter of which was a rate Commerce evidently calculated for potential resellers other than Premier that might obtain TRBs through CMEC. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China*, 52 Fed.Reg. 22,637 (June 13, 1987). By Chinese law, CMEC was the sole Chinese exporter of TRBs. *Tapered Roller Bearings From the People's Republic of China; Rescission of Initiation of Administrative Review*, 54 Fed.Reg. 41,480, 41,480 (Oct. 10, 1989). Consequently, the order originally covered TRBs sold by independent resellers, including Premier, that obtained TRBs from CMEC. As a result, the first (1987–88) and second (1988–89) reviews of the order dealt solely with Premier.

Following Timken's successful challenge to certain aspects of Commerce's final LTFV determination, Commerce found a dumping margin for CMEC and revised its order accordingly. *Tapered Roller Bearings From the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand* ("*Amended LTFV Determination* "), 55 Fed.Reg. 6669, 6669 (Feb. 26, 1990). Beginning with the third review, therefore, PRC-based entities were reviewed as exporters to the United States.

As CMEC was believed to control all PRC exports, Commerce individually named CMEC and Premier in the notice of initiation for the third review. *Initiation of Antidumping Duty Administrative Reviews*, 55 Fed.Reg. 30,490 (July 26, 1990). However,

several companies other than CMEC requested separate treatment during the review, and so, Commerce proceeded to review all PRC-based parties that provided questionnaire responses. In the final results of the third review, Commerce determined that CMEC, while continuing to function as a multi-branch company, no longer held a monopoly on the exportation of PRC TRBs. Hence, Commerce calculated separate rates for the eight participating companies: CMEC, Premier and six firms that provided questionnaire responses. *Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's Republic of China,* 56 Fed.Reg. 67,590, 67,597 (Dec. 31, 1991). Commerce also assigned an all others rate to apply to PRC firms other than those that had participated in the third review, as well as to any market-economy resellers not involved in the review.[1]

### 2. The Challenged Administrative Reviews

On June 5, 1991, Commerce published a notice of opportunity to request an administrative review for the fourth period of review of the antidumping duty order at issue. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 56 Fed.Reg. 25,663. In response, Timken, Chin Jun Industrial Ltd. ("Chin Jun"), a Hong Kong reseller of PRC bearings, and Henan Machinery and Equipment Import and Export Corporation, a PRC exporter, requested an administrative review. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Reviews ("Preliminary Results"),* 60 Fed.Reg. 44,302, 42,302 (Aug. 25, 1995). Timken specifically requested the review of *"all* merchandise covered by the order, from whatever source," and listed the 43 companies "presently known to Timken" to be sources

of PRC TRBs (36 PRC-based producers, five PRC-based exporters and two Hong Kong-based exporters). *Letter from Stewart and Stewart, Attorneys for Timken, to Hon. Robert Mosbacher, Secretary of Commerce,* P.R. Doc. No. 4, at 1, Pl.'s App., Ex. 1 (June 28, 1991). In response, Commerce initiated the fourth review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 33,251 (July 19, 1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 47,185 (Sept. 18, 1991) (naming two additional firms). In all, Commerce sent questionnaires to 43 companies named in the notices of initiation. *Preliminary Results,* 60 Fed.Reg. at 44,302.

On June 8, 1992, Commerce published a notice of opportunity to request an administrative review for the fifth period of review of the antidumping duty order at issue. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 57 Fed.Reg. 24,244. Chin Jun requested that its imports for that period be reviewed. *Preliminary Results,* 60 Fed. Reg. at 44,302. Timken requested that Commerce review "all known producers and exporters, plus any additional producers and exporters which become known during the course of the review," and provided a list of the same parties named in its fourth review request. *Letter from Stewart and Stewart, Attorneys for Timken, to Hon. Barbara H. Franklin, Secretary of Commerce,* P.R. Doc. No. 136, at 7, Pl.'s App, Ex. 6. (June 29, 1992). In response, Commerce initiated the fifth review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 57 Fed.Reg. 32,521 (July 22, 1992).

One June 7, 1993, Commerce published a notice of opportunity to request an administrative review for the sixth period of review on the antidumping duty order at issue. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Op-*

---

**1.** Commerce's practice at the time was to update the all others rate to correspond to the highest rate calculated in each review or, in this case, 8.83%. Commerce amended this rate to correspond to 2.96%, the all others rate from the amended LTFV final determination. *See Final Court Decision and Amended Final Results: 1989–90 Administrative Review of Tapered Roller Bearings and Parts Thereof from the People's Republic of China,* 61 Fed.Reg. 29,345 (June 10, 1996).

*portunity To Request Administrative Review,* 58 Fed.Reg. 31,941. Chin Jun again requested that its imports for that period be reviewed. *Preliminary Results,* 60 Fed.Reg. at 44,302. Timken requested that Commerce review the same 43 companies previously named, as well as "any other exporter from Hong Kong or any other third country and any other exporters or producers, where ever [sic] located, presently or previously part of or including within their names: China National Machinery and Equipment Import and Export Corporation[,] China National Machinery Import and Export Corporation [and] Machinery Import and Export Corporation." *Letter from Stewart and Stewart, Attorneys for Timken, to Hon. Ronald H. Brown, Secretary of Commerce,* P.R. Doc. No. 164, Pl.'s App, Ex. 8 (June 30, 1993). In response, Commerce initiated the sixth review, individually naming the 43 companies. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 58 Fed. Reg. 39,007 (July 21, 1993).

Commerce received seven responses from the 43 companies individually named in the fourth period request for review and nine responses from the companies individually named in the fifth and sixth periods requests for review. *Preliminary Results,* 60 Fed. Reg. at 44,302. The schedules for reviews four through six were eventually merged and Commerce published the preliminary and final results for the three reviews simultaneously.

In the Preliminary Results, Commerce determined that margins for exporters that did not receive a separate rate in the fourth review were 15.61% and that margins for such exporters in the fifth and sixth reviews were 23.76%. 60 Fed.Reg. at 44,305. Commerce noted that the preliminary margins did not constitute a separate-rate finding for firms that had participated to some degree in the reviews but had not qualified for separate rates. *Id.* at 44,306. Commerce further stated that, effective upon the publication of the Final Results, the cash deposit rate would be 23.76% for all remaining PRC exporters not entitled to separate rates and that the cash deposit rate will be the rate applicable to the PRC supplier of any other

non-PRC exporters of the subject merchandise from the PRC. *Id.* at 44,307.

On September 29, 1995, Transcom filed an entry of appearance' in the fourth, fifth and sixth reviews, as well as comments on the Preliminary Results. *See Transcom's Administrative Case Brief,* P.R. Doc. No. 432, Def.'s App., Ex. 2. Transcom stated that it had purchased subject merchandise at various times during the period of review from the following companies, none of which were named in Timken's requests or Commerce's notices of initiation: one Japan-based company (HIC Corporation), two Hong Kong firms (Direct Source International and Bilop International) and four PRC-based entities (China Aeolus Automotive Import & Export Corporation, Flying Dragon Machinery, CMEC Zhejiang and CMEC Hunan). *Id.* at 3.

On December 13, 1996, Commerce published its Final Results. Commerce stated that, pursuant to its nonmarket economy ("NME") policy, "all PRC exporters or producers that have not demonstrated that they are separate from PRC government control are presumed to belong to a single, state-controlled entity (the 'NME entity'), for which we must calculate a single rate (the 'PRC rate')." 61 Fed.Reg. at 65,544. Commerce recognized that 19 C.F.R. § 353.22(a) allows interested parties to request a review once a year during the anniversary month of the order and states that interested parties must list "specific individual producers" to be covered by the review. *Id.* Nevertheless, Commerce noted its initial presumption in NME cases— that all exporters from the NME are part of a single state-controlled enterprise—and interpreted this regulation as follows:

> [I]f at least one named producer or exporter does not qualify for a separate rate, all exporters that are part of the NME entity are part of the review. On the other hand, if all named producers or exporters are entitled to separate rates, the NME entity is not represented in the review and, therefore, the NME rate remains unchanged.

*Id.* In this case, Commerce concluded that one or more named PRC exporters failed to prove their independence from government control. Commerce therefore applied a

"PRC rate" to all PRC exporters, whether or not they were provided with individual notice of the proceeding, that failed to actually overcome the NME presumption. *Id.* Commerce based the PRC rate on the best information available ("BIA") because the government-controlled enterprise did not respond to the agency's questionnaires.

Transcom had made antidumping duty deposits at the all others rate established in the original investigation. However, several of Transcom's exporters were not identified by Timken in its requests for review or by Commerce in its notices of initiation of reviews and were not, therefore, provided with questionnaires or other individual notice by Commerce regarding the reviews. As they did not secure a separate rate, Commerce regarded them as part of the government-controlled entity and assessed them with the BIA rate.

### Discussion

The Court has jurisdiction over this matter under 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

Transcom contends that entries from the unnamed exporters at issue were not part of these reviews because the exporters were not named in the review requests and initiation notices. According to Transcom, these entries should therefore be liquidated at the antidumping duty deposit rate, namely the 2.96% all others rate from the Amended LTFV Determination. Transcom further alleges that, because Commerce never provided the unnamed exporters with notice and requests for information, they were not subject to the reviews. Transcom also claims that Commerce's failure to provide the unnamed exporters with notice that the review might cover them denied them of an opportunity to be heard, thereby violating constitutional due process requirements. Finally, Transcom objects to Commerce's use of punitive BIA as a basis for the unnamed exporters' margins because Commerce never actually requested information from them. Pl.'s Mem. Supp. Mot. J. Agency R. at 17–34.

Commerce acknowledges this Court's disagreement with Commerce's PRC rate reasoning and terminology in the third review in *UCF America, Inc. v. United States*, 20 CIT ——, 919 F.Supp. 435 (1996). However, Commerce maintains that, although the exporters may not have been individually notified, Commerce's employment of the PRC rate and its calculation utilizing BIA are consistent with the statute, regulations and case law. Def.'s Opp'n to Mot. J. Agency R. at 15–36. Commerce further responds that Transcom has not been deprived of due process because it does not have a protected property interest at stake in this proceeding. *Id.* at 36–38 (citing *Arjay Associates, Inc. v. Bush*, 891 F.2d 894, 896 (Fed.Cir.1989) (stating that "no one has a Congressionally untouchable right to the continued importation of any product.")). Timken agrees generally with Commerce's position. Timken's Opp'n to Mot. J. Agency R. at 6–11.

#### 1. *Inclusion and Notice Issues*

Transcom essentially claims that, because its suppliers were not given individual notice, they did not have an opportunity to demonstrate their independence from the PRC entity and avoid the PRC rate. In sum, Transcom's position is that law requires exporters in NMEs to be specifically named in the notice of initiation and to be provided notice of the pendency of a proceeding that could adversely affect them before being reviewed. Transcom therefore objects to the assess-

ment of the PRC rate and contends unnamed exporters should be assessed the amount deposited at the time of entry.

The applicable antidumping law does not specify the method by which Commerce is to assign margins to reviewed and unreviewed companies. *See* 19 U.S.C. § 1673d(a)(1) (1988); 19 U.S.C. § 1675. Rather, the antidumping statute directs that, upon request, Commerce is to conduct periodic reviews to be "the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties." 19 U.S.C. § 1675(a)(2). Commerce's regulations in effect at the time specified that an interested party may request a review of "specified individual producers or resellers" and added that, without such a request, Commerce is to assess an exporter antidumping duties, and the deposit of estimated antidumping duties, at the previously-established rate. 19 C.F.R. § 353.22(a), (c) and (e) (1994).

In market economy cases, Commerce has assigned individual rates to reviewed companies and an all others rate to non-reviewed companies. In NME cases, however, Commerce has employed an "NME presumption," whereby all exporters or producers either qualify for a separate company-specific rate by demonstrating that they enjoy both *de jure* and *de facto* independence from the central government, or remain part of the NME entity and receive the NME rate. *See, e.g., Sigma Corp. v. United States,* 117 F.3d 1401, 1405–06 (Fed.Cir.1997); *UCF,* 20 CIT at ——, 919 F.Supp. at 440. In such cases, because the NME enterprise has been investigated or reviewed, it is unnecessary for Commerce to calculate an all others rate, as all exporters and producers have been, at least in theory, reviewed. The Court of Appeals for the Federal Circuit ("CAFC") has upheld Commerce's presumption of state control in NME cases, stating the following:

> We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. The antidumping statute recognizes a close

correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources. *See* 19 U.S.C. § 1677(18)(B)(iv), (v). Moreover, because the exporters have the best access to information pertinent to the "state control" issue, Commerce is justified in placing on them the burden of showing a lack of state control. *See Zenith Electronics Corp. v. United States,* 988 F.2d 1573, 1583 (Fed.Cir.1993) ("The burden of production should belong to the party in possession of the necessary information.").

*Sigma,* 117 F.3d at 1405–06.

What remains specifically unanswered by the courts, however, is whether Commerce's treatment of unnamed NME exporters is proper. Indeed, Transcom's unnamed exporter inclusion, notice and due process claims center around one consistent theme: if an unnamed exporter is not notified that it is included within a review, then it does not have the opportunity to demonstrate it is entitled to a separate company rate under Commerce's applicable procedures. Consequently, the narrow issue for this Court is whether Commerce may assign a country-specific rate to an NME company that was not individually notified by Commerce, or its government, that its merchandise may be covered by a pending antidumping investigation.

The Court agrees that Commerce's use of a country-specific rate for unnamed exporters in this case is supported by substantial evidence. The NME presumption ostensibly conflicts with Commerce's regulation requiring a review of only specified individual producers and deprives unnamed parties the opportunity to assert their individual independence. In fact, in *UCF,* 20 CIT at ——, 919 F.Supp. at 440–41, this Court raised certain concerns about Commerce's assessment of a PRC rate, as opposed to an all others rate. The Court continues to recognize that if exporters are not named, then they may not know they are subject to a review until after a review is completed. Nevertheless, in the interest of efficient administration of the dumping law to NMEs, the Court agrees that Commerce is compelled to resort to certain alternative methods, in this case the

NME presumption. *See Nation Ford Chem. Co. v. United States*, 21 CIT ——, ——, 985 F.Supp. 133, 134 (1997) (citing 19 U.S.C. § 1677b(c) and describing the alternative methods Commerce should use in NME situations where Commerce cannot determine the foreign market value of relevant merchandise, including ignoring certain transactions and using information from a surrogate market economy); *see also Sigma*, 117 F.3d at 1405–06 (upholding Commerce's use of the NME presumption). The logical implementation of the CAFC-endorsed presumption requires that certain unnamed exporters inevitably will be subject to review by default and assessed country-wide margins without being individually notified, sent questionnaires and verified.

■ Transcom apparently wishes the Court to require that Commerce issue questionnaires to all branches and offices of the NME entity, a requirement that would eviscerate the very purpose of the NME presumption. When Commerce employs its NME presumption, all exporters or producers either qualify for a separate company rate or are deemed part of the NME entity and receive the PRC rate. Therefore, because all exporters or producers, at least in theory, have been reviewed, the calculation of an all others rate is unnecessary. While this procedure is admittedly at odds with the letter of Commerce's own regulations requiring the review, upon request, of specific individual producers, muddling the CAFC's endorsement of the NME presumption would undermine Commerce's administration of the dumping law on NME entities, a task that is inherently difficult, and render the NME presumption impotent. *See Sigma*, 117 F.3d at 1406 (stating that Commerce properly places the burden of demonstrating lack of state control on exporters because they have the best access to pertinent information). In sum, Commerce's requirement of notice in NME cases is fulfilled with the notification of the NME country's appropriate governmental authority and the notification of all parties enumerated by petitioners and listed in the notice of initiation.

■ The Court further concludes that Transcom's due process claim is without merit. The issue before the Court is whether Transcom's due process rights have been violated because the unnamed NME exporters were not given actual individual notice that they were included in these reviews. First, Commerce's and Timken's responses that Transcom has not been deprived of due process because it does not have a protected property interest at stake in this proceeding mistake Transcom's position; Transcom is not claiming it has a right to import but, rather, that the unnamed exporters have the right to notice and an opportunity to be heard before Transcom's denial of property, *i.e.*, its monetary dumping liability.

Nevertheless, the Court agrees that the unnamed exporters and, therefore, Transcom have not been denied their constitutional rights to due process. Transcom primarily supports its position by citing to *Sigma Corp. v. United States*, 17 CIT 1288, 1303, 841 F.Supp. 1255, 1267 (1993), where this Court decided that Commerce's failure to afford notice to comment on Commerce's change from a company-specific rate to a country-wide rate between the preliminary and final results was a violation of plaintiff's due process rights because the preliminary determination did not mention that Commerce was considering a country-wide rate. In this case, Commerce assessed the PRC rate to the companies at issue in accordance with its CAFC-endorsed NME policy. Consequently, as the Court determined above, Commerce properly assessed the companies at issue the PRC rate, even though they were not individually reviewed, because they failed to demonstrate their independence from the NME entity.

### 2. *Best Information Available*

■ The statute directs that Commerce may apply BIA "whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required or otherwise significantly impedes an investigation." 19 U.S.C. § 1677e(c). Transcom claims that Commerce's employment of BIA to the unnamed exporters in this case was improper because it was *other* exporters who failed to respond to Commerce's questionnaires. In essence,

Transcom contends that, before Commerce may resort to BIA, it must have requested information from an individual party.

The Court concludes that Transcom's BIA claim is also without merit. Numerous PRC exporters chose not to respond to Commerce's questionnaires in this case. *See Preliminary Results*, 60 Fed.Reg. at 44,302. Under the NME presumption accepted above, the unnamed exporters at issue are considered part of the government-controlled entity. The Court also notes that, under the circumstances, the use of BIA furthers compliance with Commerce's requests for information by encouraging the NME entity to respond to Commerce's requests in future reviews and demonstrate that its margin is less than the BIA rate; requiring Commerce to retain the Amended Final LTFV all others rate of 2.96% provides no such incentive. Consequently, Commerce was well within its statutorily granted authority to base the unnamed exporters' margins and future antidumping duty deposits on BIA.

*Conclusion*

Commerce's decision to assess Transcom's merchandise the PRC rate is supported by substantial evidence and is, therefore, affirmed. Commerce is sustained as to all other issues.

**JUDGMENT**

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that plaintiff's motion for judgment on the agency record is denied in all respects and the Department of Commerce, International Trade Administration's determination is affirmed; and it is further

**ORDERED** that this case is dismissed.