TRANSCOM, INC., Plaintiff–Appellant,

and

L & S Bearing Company, Plaintiff,

v.

UNITED STATES, Defendant–Appellee,

and

The Timken Company, Defendant–Appellee.

No. 01–1138.

United States Court of Appeals,
Federal Circuit.

June 27, 2002.

George W. Thompson, Neville, Peterson & Williams, of Washington, DC, argued for plaintiff-appellant. With him on the brief were John M. Peterson, and Curtis W. Knauss.

Henry R. Felix, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Velta A. Melnbrencis, Assistant Director. Of counsel on the brief was William Isasi, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

Wesley K. Caine, Stewart and Stewart, of Washington, DC, argued for defendant-appellee The Timken Company. With him on the brief were Terence P. Stewart, Amy S. Dwyer and Patrick John McDonough. Of counsel was Amy A. Karpel.

Before SCHALL, Circuit Judge, ARCHER, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

In a review of an antidumping order, the Commerce Department determined that two Hong Kong resellers of tapered roller bearings from the People's Republic of China ("PRC" or "China") were subject to a dumping margin calculated using the "best information available" ("BIA"). Transcom, Inc., which purchased tapered roller bearings from the two Hong Kong resellers for importation into this country, challenged Commerce's determination before the Court of International Trade, which upheld Commerce's decision. We agree with the Court of International Trade that Commerce provided the degree of notice required by statute and regulation, and that the use of a BIA-based antidumping rate was not unlawful.

## I

### A

In an antidumping investigation covering goods exported from a country with a market-based economy, Commerce sets individual antidumping duty rates for investigated companies. Entries from other companies are subject to an "all others" rate, which is typically computed as a weighted average of the individual rates. Thereafter, a company is subject to either its individual rate or the all others rate unless the rate is changed as a result of an administrative review of the dumping order conducted pursuant to 19 U.S.C. § 1675. An interested party, typically a member of the affected domestic industry, may request a review of a particular exporter if it believes the current rate for that exporter is too low. Conversely, an exporter may request a review of its own exports if it believes its rate is too high.

Before 1991, Commerce used the combination of individual rates and an all others rate for antidumping investigations of imports not only from market economy countries, but also from countries with nonmarket economies ("NMEs") such as China. In 1991, however, Commerce reversed course and decided that individual rates were not appropriate in an NME setting. See *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 2742, 2744 (Jan. 24, 1991); *Final Determination of Sales at Less than Fair Value: Sparklers From the People's Republic of China,* 56 Fed.Reg. 20,588, 20,589 (May 6, 1991). Instead, Commerce determined that NME exporters would be subject to a single, countrywide antidumping duty rate unless they could demonstrate legal, financial, and economic independence from the Chinese government (referred to by Commerce as "the NME entity"). 56 Fed. Reg. at 2744.

This court upheld the application of this "NME presumption" in *Sigma Corp. v. United States,* 117 F.3d 1401 (Fed.Cir. 1997). Under the NME presumption, a company that fails to demonstrate independence from the NME entity is subject to the countrywide rate, while a company that demonstrates its independence is entitled to an individual rate as in a market economy. *Id.* at 1405–06. The Court of International Trade has stated that when an NME rate is used in conjunction with individual rates, it is unnecessary for Commerce to calculate an all others rate since all exporters have, at least in theory, been reviewed. *Transcom, Inc. v. United States,* 5 F.Supp.2d 984, 989 (Ct. Int'l Trade 1998).

### B

In 1986, Commerce launched an antidumping investigation of Chinese-manu-

factured tapered roller bearings in response to a request from the Timken Company, a domestic producer of tapered roller bearings. The investigation ultimately led to the establishment of dumping margins for two entities. The first, the state-controlled China National Machinery and Equipment Import and Export Corporation ("CMEC"), which was then the only exporter of tapered roller bearings from China, received an antidumping duty rate of 4.69%. The second, Premier Bearing & Equipment, Ltd. ("Premier"), a Hong Kong-based trading company, received an antidumping duty rate of 0.97%. Commerce also established an all others rate of 2.96% for other potential Chinese exporters of tapered roller bearings. *Tapered Roller Bearings From the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand,* 55 Fed.Reg. 6669 (Feb. 26, 1990).

The final results of the first two annual reviews, which covered the period from February 1987 to May 1989, were published on January 2, 1991. In those reviews, Commerce had not yet begun the practice of applying the NME presumption. The reviews, which covered only Premier, left intact both Premier's antidumping duty rate of 0.97% and the all others rate of 2.96%. Commerce also established a "new shipper rate" of 0.97% for exporters whose first shipment from China occurred after May 31, 1989. *Final Results of Antidumping Duty Administrative Reviews: Tapered Roller Bearings and Parts Thereof From the People's Republic of China,* 56 Fed.Reg. 66 (Jan. 2, 1991).

In the third administrative review, which covered the period from June 1989 to May 1990, Commerce changed its methodology for setting rates. In response to requests from various Chinese exporters,

Commerce established eight company-specific dumping margins. Commerce also explained that it was abandoning its use of the new shipper rate. Instead, Commerce stated that all shippers not having an individual rate would be subject to the all others rate, which would be equal to the highest rate for any reviewed firm and adjusted accordingly in each successive administrative review. Commerce therefore changed the rates for all Chinese exporters of tapered roller bearings, even though some of the affected companies were not listed in the notice of initiation for the review. *Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's Republic of China,* 56 Fed. Reg. 67,590 (Dec. 31, 1991).

On appeal of the third administrative review, the Court of International Trade held that Commerce could not use the all others rate to adjust dumping margins for companies outside the scope of the review. *UCF Am. Inc. v. United States,* 870 F.Supp. 1120, 1128 (Ct. Int'l Trade 1994) ("*UCF I* "). Accordingly, Commerce reinstated the 2.96% rate for those exporters on remand. In doing so, however, Commerce labeled that rate a "PRC rate" rather than an "all others" rate. The Court of International Trade struck down that practice, noting that a single countrywide rate did not take into account independent exporters within China and would lead to excessive complexity in conducting administrative reviews. *UCF Am. Inc. v. United States,* 919 F.Supp. 435, 440–41 (Ct. Int'l Trade 1996) ("*UCF II* ").

Before the completion of judicial review of the results of the third administrative review, Commerce initiated the fourth, fifth, and sixth administrative reviews, covering June 1990 through May 1993. In the notices of initiation for each of those reviews, Commerce listed 43 companies

that it believed were exporters of tapered roller bearings. Commerce grouped the three review periods together in announcing its final results. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews,* 61 Fed. Reg. 65,527 (Dec. 13, 1996).

Despite the court's disapproval of a single countrywide rate in *UCF II,* Commerce persisted. It announced that the PRC rate would be applicable to all exporters unless they had demonstrated their independence from the NME entity. Commerce stated that the NME presumption applied to a company whether or not it was named in the notice of initiation for a review and whether or not it had received a questionnaire from Commerce. Commerce also stated that non-Chinese exporters of tapered roller bearings would be subject to the rates applicable to their Chinese suppliers.

During the fourth, fifth, and sixth review periods, Transcom had entries from companies that, although not listed in the notices of initiation for those reviews, were subject to the PRC rate. Transcom appealed. The Court of International Trade, which had previously struck down the use of the PRC rate in *UCF II,* upheld Commerce's determinations in the fourth, fifth, and sixth reviews "in the interest of efficient administration of the dumping law to NMEs," citing this court's endorsement of the NME presumption in the *Sigma* case. *Transcom, Inc. v. United States,* 5 F.Supp.2d at 989.

This court reversed, although not with respect to the use of the NME presumption itself. Instead, we held that because Transcom's exporters were not named in the notices of initiation, their rates could not be adversely affected. *Transcom, Inc. v. United States,* 182 F.3d 876, 881 (Fed. Cir.1999) ("Transcom had no reason to expect that the antidumping duties on its exporters' products could be affected by proceedings in which the exporters were not named as parties.").

## C

The seventh administrative review of the antidumping order, the one at issue in this case, was also initiated prior to Commerce's announcement of a single PRC rate for tapered roller bearings, which was first published in the Federal Register in August 1995. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Reviews,* 60 Fed.Reg. 44,-302, 44,303 (Aug. 25, 1995). On June 7, 1994, Commerce published a notice of opportunity to request a review of the tapered roller bearing antidumping order for the seventh administrative review period, which covered June 1993 to May 1994. In response, the Timken Company requested a review of 101 specific companies, both in China and in Hong Kong, as well as "all merchandise covered by the order, from whatever source." Commerce informed the Chinese government of the review and requested information regarding all companies, including third parties, that exported tapered roller bearings from China. On August 24, 1994, Commerce initiated the seventh administrative review, specifically naming the 101 companies listed by Timken. *Initiation of Antidumping Duty Administrative Reviews and Request for Revocation in Part,* 59 Fed.Reg. 43,537, 43,538–39 (Aug. 24, 1994). The notice also stated that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review." *Id.* at 43,539. Commerce sent a copy of the notice of initiation and the questionnaires to the Chinese government in December 1994, requesting that it forward the questionnaires to the companies named in the notice. In that

communication, Commerce indicated that information might also be required from exporters not specifically listed in the notice.

Commerce published the final results of the review on February 11, 1997. At that time, Commerce established individual rates for several companies, as well as adjusting the PRC rate to 25.56% for those companies that failed to demonstrate their independence from the NME entity. Commerce also continued its practice of assigning rates for third-country exporters of Chinese tapered roller bearings based on the rates assigned to their Chinese suppliers. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order*, 62 Fed.Reg. 6189 (Feb. 11, 1997).

■ The PRC rate assigned in the seventh administrative review was based on the "best information available" or "BIA." Commerce is permitted to use BIA "whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation." 19 U.S.C. § 1677e(c) (1988). While BIA-based rates are intended to be adverse, the central purpose of BIA is not to punish parties. *See Nat'l Steel Corp. v. United States*, 870 F.Supp. 1130, 1136 (Ct. Int'l Trade 1994). Instead, the objective of BIA is to aid Commerce in determining dumping margins as accurately as possible. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990). The threat of BIA-based rates helps accomplish this objective by encouraging parties to submit information that has been requested by Commerce. Without BIA, parties would be able to control their dumping rates by "selectively providing [Commerce] with in-

formation." *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1572 (Fed. Cir.1990).

Transcom appealed Commerce's determination. Specifically, the company challenged the antidumping margins as they applied to two of its Hong Kong resellers from which it imported Chinese-produced tapered roller bearings during the review period. The two resellers were Direct Source International and Gold Hill International Trading & Services Co. Neither company was named either in Timken's request or in the notice of initiation for the seventh administrative review. Transcom claimed that because of the lack of specific notice, the entries from those companies were not subject to the review at all, much less subject to a BIA-based rate.

The Court of International Trade affirmed Commerce's determination. *Transcom, Inc. v. United States*, 121 F.Supp.2d 690 (Ct. Int'l Trade 2000). As to whether Transcom's suppliers had sufficient notice to justify including them within the administrative review, the court rejected Transcom's argument that the governing statute and regulations required Commerce to identify exporters by name in the notice of initiation in order for them to be covered by the review. The court also rejected Transcom's argument that the notice given in the notice of initiation was constitutionally insufficient under the Due Process Clause of the Fifth Amendment.

As to whether it was appropriate to apply a BIA-based antidumping duty rate to Transcom's suppliers, the court agreed with Commerce that by "conditionally cover[ing]" Transcom's Hong Kong suppliers and their Chinese producers, Commerce in effect had requested information from those parties, which did not provide the requested information. Because those parties did not provide information neces-

sary to determine whether they were entitled to a separate antidumping duty, and how much that duty should be, the court ruled that it was permissible for Commerce to calculate the rate on the basis of BIA. *Transcom*, 121 F.Supp.2d at 704. As to Transcom's Hong Kong suppliers, the court held that it was permissible for Commerce to apply the BIA-based antidumping rate to the products exported by those suppliers, because they failed to establish that they were receiving products from Chinese producers who were entitled to a lower antidumping duty rate.

## II

On appeal, Transcom argues that the statutes and regulations that were in effect at the time of the seventh administrative review required that a company be specifically named in the request for review and the notice of initiation in order to be subject to the results of the review. Transcom contends that it was improper for Timken to request that the administrative review encompass not only the 101 companies it named in its request, but also "all merchandise covered by the [antidumping] order, from whatever source." Transcom similarly argues that it was improper for Commerce in the Notice of Initiation to include not only the named companies, but also the statement that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review." In addition, Transcom argues that the reference to exporters that were "conditionally covered" by the review did not provide sufficient notice that the products sold to Transcom by Transcom's suppliers and resellers could be within the scope of the review and thus subject to antidumping duties.

## A

The statute that governed administrative reviews at the time of the initiation of the administrative review at issue in this case was the 1988 version of 19 U.S.C. § 1675(a). It provided that Commerce must conduct an administrative review of an antidumping order "if a request for such a review has been received and after publication of notice of such review in the Federal Register." The regulation that applied at the time was more detailed. It stated that an "interested party ... may request in writing that the Secretary conduct an administrative review of specified individual producers or resellers." 19 C.F.R. § 353.22(a) (1994).

■ Transcom argues that the statute and the regulation require a requester to identify by name all companies for which review is sought, and that a request that is generic in whole or in part, such as the request submitted by Timken, is improper. Transcom further argues that any review conducted in response to a request filed under section 353.22(a) of the 1994 regulation is limited to those companies that are specifically named in the request.

The Court of International Trade rejected Transcom's argument, and so do we. The governing statute, 19 U.S.C. § 1675(a) (1988), does not limit Commerce's administrative review to those companies specifically named in the interested party's request for review. Furthermore, although the applicable regulation requires specificity in a request for review, *see* 19 C.F.R. § 353.22(a) (1994), it places no such limitation on Commerce. To the contrary, the regulation authorizes Commerce to define the scope of the review independent of the request. *Id.* § 353.22(c). Accordingly, we see no statutory or regulatory basis for ruling that when Commerce conducts an administrative review in response to a request from an interested party, the scope of the review is limited to the scope of the interested party's request. *See UCF I,* 870 F.Supp. at 1124–26.

Commerce's view that section 353.22(a) does not foreclose the review of companies not specifically named in a review request is in keeping with the recognition by this court that the regulation placed limits on the scope of a request "for [Commerce's] benefit, not for the benefit of the subjects of the requested investigation." *Asociacion Colombiana de Exportadores de Flores v. United States,* 903 F.2d 1555, 1559 (Fed.Cir.1990). *See also UCF I,* 870 F.Supp. at 1126 ("Commerce's regulation relating to annual reviews is requester oriented and, likewise, imposes no burden on Commerce.").

Section 353.22 was adopted in response to a statutory change that was designed to reduce the burden on Commerce of conducting annual administrative reviews of antidumping orders. Prior to 1984, 19 U.S.C. § 1675(a) provided for a mandatory annual review of all dumping orders. *See Floral Trade Council v. United States,* 888 F.2d 1366, 1369 (Fed.Cir.1989). The Trade and Tariff Act of 1984, however, amended this provision to require a review only when a request was received. *Id.* The purpose of the amendment was to "reduce the administrative burden on the Department of Commerce of automatically reviewing every outstanding order even though circumstances do not warrant it or parties to the case are satisfied with the existing order." *Id.* (quoting H.R.Rep. No. 98–725, at 22–23 (1984)). Nothing in the legislative history of the amendment indicates that it was intended to limit Commerce's ability to frame administrative reviews more broadly than the triggering requests for review. The conditional inclusion in the review of "[a]ll other exporters of tapered roller bearings" was therefore not foreclosed by either statute or regulation.

## B

In *Transcom, Inc. v. United States,* 182 F.3d 876 (Fed.Cir.1999), this court described the statutory and regulatory notice provisions as requiring that "any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Commerce Department policy, whether particular entries in which it has an interest may be affected by the administrative review." *Id.* at 882–83. An analysis of whether notice in the seventh administrative review was sufficient thus turns on both the language of the notice of initiation and Commerce's policy at that time for conducting reviews.

■ There is nothing unclear about the reference in the Notice of Initiation to "[a]ll other exporters of tapered roller bearings," particularly since the list of companies to which the "all other exporters" clause was appended included both Chinese producers and Hong Kong resellers of tapered roller bearings. Transcom focuses on the statement in the Notice of Initiation that the class of "all other exporters" would be "conditionally covered," and contends that the term "conditionally covered" was insufficient to give notice to Transcom's Hong Kong resellers and their Chinese producers that they were within the scope of the administrative review.

Although Commerce had used the "conditionally covered" language prior to the notice of initiation in this case, *see, e.g., Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 59 Fed.Reg. 2593 (Jan. 18, 1994), Commerce did not actually publish a description of the way in which its conditional coverage operated until well after the time period for responding to the seventh administrative review had passed, *see, e.g.,* 61 Fed. Reg. 65,527, 65,545 (Dec. 13, 1996). According to Transcom, Commerce's failure to explain the operation of the "conditional coverage" regime prejudiced Transcom's ability to protect its interests.

Contrary to Transcom's contention, Commerce's failure to provide a full explanation of the meaning of "conditional coverage" did not deprive Transcom or its suppliers of the requisite notice. While it would have been preferable if Commerce had explained the meaning of the term, it was clear that all exporters of tapered roller bearings from China were subject, in the first instance, to the administrative review. Although the "condition" that might make the review inapplicable to particular exporters was not explained, the advisement certainly provided notice that the exporters' interests might be affected, which is all that the statutory notice provision requires. *See Transcom,* 182 F.3d at 884. Thus, in light of the notice of initiation for the seventh review, it cannot have come as a surprise that Transcom's Hong Kong resellers were included in the review.

In this respect, this case differs significantly from our previous *Transcom* decision, 182 F.3d 876. The notice of initiation in that case was limited to identifying specific exporters; it contained no indication that other, unnamed exporters were subject to the review. As a result, the clear implication of the notice was that parties that were not named in the notice were excluded from the review; we rejected Commerce's argument that all other exporters were deemed subject to the review merely by operation of the NME presumption. In this case, by contrast, the notice of initiation advised any entity exporting tapered roller bearings manufactured in China that it was within the scope of the administrative review and would be subject to antidumping duties depending on the outcome of the review process.

Based on the language of the notice of initiation, Transcom had at least two options if it wished to avoid the possible adverse effects of an unfavorable review of its suppliers: it could have protected itself either by ensuring that its Chinese suppliers participated in the review and proved their entitlement to separate rates, or it could have ensured that its Hong Kong resellers demonstrated their entitlement to intermediate country rates under 19 U.S.C. § 1677b(f) (1988). Thus, while Commerce certainly could have been more explicit about the conditional nature of the review, Transcom cannot credibly say that it was surprised by the inclusion of its entries in the administrative review and left without recourse to protect itself against an unfavorable antidumping duty.

■ Transcom also contends that Commerce's use of the phrase "conditionally covered" made it impossible for Commerce to notify the Customs Service as to the scope of the review in the manner specified by the regulations. Commerce is required to notify Customs as to the scope of a review upon receiving a timely request for review. 19 C.F.R. § 353.22(e)(2) (1994). Customs uses that information for liquidation purposes: either to assess antidumping duties for those items within the scope of the review, or to collect duties at the cash deposit rate for those items not within the scope of the review. Transcom asserts that section 353.22(e)(2) imposes a requirement that Commerce notify Customs of the scope of the review based on the request for review. Thus, according to Transcom, the scope of the review must be determinable from the request alone. For that reason, Transcom contends, Commerce violated the regulation by using conditional notice, which did not allow Commerce to provide liquidation information to Customs until after the review was complete.

That argument is without merit. Section 353.22(e)(2) requires only that after receiving a request for review, Commerce must provide Customs with information describing the scope of the review. For

Commerce to advise Customs that entries of a particular class (in this case, all imports of Chinese-origin tapered roller bearings coming from sources other than those designated by name) are "conditionally covered" merely requires Customs to treat those entries as presumptively subject to the administrative review, and to postpone liquidation of those entries until after the review is completed and it is determined whether particular entries are subject to an antidumping duty. That procedure, which requires Commerce to provide liquidation instructions to Customs with respect to all covered and "conditionally covered" entries at the conclusion of the review, is not inconsistent with anything in section 353.22(e)(2).

In sum, considering the language of the notice of initiation and Commerce Department policy, we believe that a "reasonably informed party" in Transcom's position, *Transcom*, 182 F.3d at 882, would have been aware that the entries from its Hong Kong resellers would be subject to the seventh administrative review. Because we conclude that the notice of initiation was sufficient to give reasonable notice that Transcom's entries were potentially within the scope of the administrative review, we also reject Transcom's argument that the notice was insufficient to satisfy the requirements of the Due Process Clause of the Fifth Amendment. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (notice is constitutionally sufficient if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

### III

Transcom next argues that, even assuming all exporters of tapered roller bearings from China were subject to the administrative review, Commerce unlawfully used

BIA to calculate the dumping margins of its imported products.

■ The governing statute, 19 U.S.C. § 1677e(c) (1988), permits the use of BIA only when a party "refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation." We have interpreted that statutory language to require noncompliance with an information request before resort to the best information available rule is justified. *See Olympic Adhesives*, 899 F.2d at 1574; *see also Sigma Corp. v. United States*, 841 F.Supp. 1255, 1263 (Ct. Int'l Trade 1993) (disallowing the use of BIA because the party in question "never refused and was never unable to supply the information"); *Mitsui & Co. v. United States*, 18 C.I.T. 185, 199 (1994) ("Commerce may not resort to BIA because of an alleged failure to provide further explanation when that additional explanation was never requested."); *Floral Trade Council v. United States*, 775 F.Supp. 1492, 1498 (Ct. Int'l Trade 1991). Transcom argues that Commerce should not have been permitted to resort to BIA in calculating antidumping rates for Direct Source, Gold Hill, and their Chinese suppliers, because Commerce has failed to show that those entities received questionnaires from Commerce or were directed to provide information to Commerce.

While it is true that Transcom's Hong Kong suppliers, Direct Source and Gold Hill, were not sent questionnaires, the identity of the Chinese producers who sold products to Direct Source and Gold Hill for resale to Transcom has not been disclosed, and there is therefore no way to determine on this record whether the Chinese producers of Transcom's products were among those companies that were listed in the notice of initiation and were sent questionnaires. In Commerce's view,

however, it is irrelevant whether those producers, or the Hong Kong resellers, received questionnaires.

Commerce's position, as announced in the final results of the present administrative review, is as follows: (1) it is Commerce's policy to treat all exporters in an NME country as part of the single state-controlled entity unless they prove that they are independent of government control; (2) because some of the companies specifically named in the seventh administrative review did not establish their independence from the state-controlled entity, Commerce regarded the state-controlled entity as part of the review; (3) because of the failure of those companies to provide the requested information, Commerce based the antidumping duty for the state-controlled entity on BIA; (4) because Transcom's producers were not shown to be independent of the state-controlled entity, they were assigned the BIA-based rate given to the state-controlled entity; and (5) because Transcom's Hong Kong suppliers did not establish that they had obtained products from independent Chinese producers, or that the Chinese producers from whom they obtained products did not know the products were destined for export to the United States, the BIA-based rate was applicable to the Hong Kong suppliers as well.

Commerce's position has the effect of imposing on Transcom's suppliers the duty to provide information sufficient to establish their independence from the NME entity or run the risk of being subject to a BIA-based antidumping duty rate. Transcom argues that imposing such a duty is contrary to section 1677e, which prohibits Commerce from imposing BIA-based rates on a company that had not refused to provide information or otherwise failed to cooperate in Commerce's investigation.

That argument sidesteps the core principle underlying the NME presumption, because it proceeds from the unspoken assumption that the producers are independent of the NME entity, when in fact the NME presumption begins with the assumption that the producers are part of the NME entity until they prove otherwise. If the producers are assumed from the outset to be part of the NME entity, then Commerce's conclusion that the NME entity is subject to a BIA-based rate logically requires Commerce to apply the same BIA-based rate to all other producers within the scope of the review that have not proved their independence of the state.

Accordingly, while section 1677e provides that Commerce may not assign a BIA-based rate to a particular party unless that party has failed to provide information to Commerce or otherwise failed to cooperate, the statute says nothing about whether Commerce may presume that parties are entitled to independent treatment under section 1677e in the first instance.

█ There is a remaining question whether Commerce provided adequate notice to Transcom of its NME policy. To answer that question, we must look to the legal context in August 1994, when the notice of initiation for the seventh administrative review was published.

More than three years earlier, Commerce had announced its policy of treating exporters in NME countries as presumptively part of the NME entity. *See Iron Construction Castings,* 56 Fed.Reg. at 2744; *Sparklers From the People's Republic of China,* 56 Fed.Reg. at 20,589. In setting forth its NME policy, Commerce made clear the consequences to an exporter of not rebutting the presumption of state control and establishing its independence: the exporter would be assigned the single rate given to the NME entity. Shortly thereafter, the Court of International Trade acknowledged and sustained

Commerce's NME policy. *See Tianjin Mach. Imp. & Exp. Corp. v. United States,* 806 F.Supp. 1008, 1013–14 (Ct. Int'l Trade 1992). Accordingly, Transcom was on notice that it would be subject to an NME rate if it did not establish its independence.

Furthermore, Transcom was on notice that Commerce had used BIA to set the NME rate. *Tianjin,* 806 F.Supp. at 1015. The use of BIA for that purpose was not simply a position taken in some unrelated matter, but was a position taken in the very dumping order that is at issue in this case. Specifically, in the third administrative review, Commerce set both company-specific rates and an all others rate equal to the highest rate of the individually reviewed companies. *Preliminary Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's Republic of China,* 56 Fed.Reg. 50,309, 50,310 (Oct. 4, 1991); *Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's Republic of China,* 56 Fed. Reg. 67,590, 67,596 (Dec. 31, 1991). That approach was virtually identical to the methodology at issue in the present administrative review, where Commerce proposed both individual rates and a PRC rate, the latter being equal to the highest of the individual margins. 62 Fed.Reg. at 6214. Thus, Transcom was fairly on notice both of Commerce's NME policy, and of the manner in which Commerce intended to set its BIA-based rates for the NME entity.

In the course of the administrative review, various of the specifically identified Chinese exporters failed to respond to Commerce's investigation. Their failure to do so had two consequences: (1) it meant that they failed to establish their independence from (and therefore were properly treated as part of) the state-controlled NME entity; and (2) it meant that the statutory prerequisite for applying a BIA-based antidumping rate was met as to those producers, and thus, by extension, as to the state entity of which they were a part. It therefore follows that because the uncooperative producers were part of the NME entity and were subject to a BIA-based rate, and because Transcom's suppliers did not establish their independence from the NME entity, Transcom's imports were subject to a BIA-based assessment of antidumping duties.

■ Finally, Transcom argues that in any event it was improper to impose a BIA-based antidumping rate on Transcom's Hong Kong suppliers, since they were not Chinese firms and thus were not subject to the NME presumption. As the trial court explained, however, the "first to know" rule applied by Commerce to determine which seller in a chain of distribution is subject to antidumping duties dictates that it is the first seller in the chain who knows or has reason to know that the products are destined for export to the United States on whom the antidumping duty is imposed. One consequence of Transcom's failure to identify the Chinese producers that manufactured its imported products is that Transcom lost its opportunity to show that those producers did not know or have reason to know that the goods they were producing were destined for export to the United States. Commerce therefore properly assessed the antidumping duty by looking to those unidentified producers rather than to the Hong Kong resellers to whom they sold the exported tapered roller bearings.

In sum, we conclude that the consequence of our holding that Transcom's Chinese producers were within the scope of the administrative review is that it was

permissible for Commerce to subject Transcom's imports to a BIA-based anti-dumping duty. We therefore affirm the decision of the Court of International Trade, which upheld the final results of the administrative review at issue in this case.

*AFFIRMED.*