Slip Op. 12-135

UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

JIANGSU CHANGBAO STEEL TUBE CO., LTD.<br>
and JIANGSU CHANGBAO PRECISION TUBE<br>
CO., LTD.,<br><br>

       Plaintiffs,<br><br>

       v.<br><br>

UNITED STATES,<br><br>

       Defendant,<br><br>

       and<br><br>

TMK IPSCO *et al.*,<br><br>

       Defendant-Intervenors.

</td><td>

Before: Donald C. Pogue,<br>
       Chief Judge<br><br>

Court No. 10-00180<br><br>

**PUBLIC VERSION**

</td></tr>
</table>

OPINION

[Final determination of sales at less than fair value
sustained.]

Dated: November 14, 2012

William Silverman, Douglas J. Heffner and Richard P.
Ferrin, Drinker Biddle & Reath LLP, of Washington, DC, for
Plaintiffs Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu
Changbao Precision Tube Co., Ltd.

L. Misha Preheim and Marcella Powell, Trial Attorneys,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice, of Washington, DC, and New York, NY, for Defendant.
With them on the brief were Stuart F. Delery, Acting Assistant
Attorney General, Jeanne E. Davidson, Director, and Patricia M.
McCarthy, Assistant Director. Of counsel on the brief was
Jonathan M. Zielinski, Office of the Chief Counsel for Import
Administration, U.S. Department of Commerce, of Washington, DC.

Roger B. Schagrin, Michael J. Brown and John W. Bohn,
Schagrin Associates, of Washington, DC, for Defendant-
Intervenors TMK IPSCO, V&M Star L.P., Wheatland Tube

Corporation, Evraz Rocky Mountain Steel and United Steel Workers.

Robert E. Lighthizer, Jeffrey D. Gerrish and Soo-Mi Rhee, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.

Alan H. Price, Tessa Capeloto and Maureen E. Thorson, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Maverick Tube Corporation.

**Pogue, Chief Judge:**  In this action, Plaintiffs seek review of certain determinations made by the United States Department of Commerce ("Commerce") during an antidumping investigation of oil country tubular goods ("OCTG" or "subject merchandise") from the People's Republic of China ("China" or "PRC").[1]  Currently before the court is Plaintiffs' Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu Changbao Precision Tube Co., Ltd. (collectively "Changbao") motion pursuant to USCIT Rule 56.2 for judgment on the agency record. Specifically, Plaintiffs challenge Commerce's decision to apply to Changbao the antidumping duty cash deposit rate that was

---

[1] See Certain Oil Country Tubular Goods from the People's Republic of China, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19, 2010) (final determination of sales at less than fair value, affirmative final determination of critical circumstances and final determination of targeted dumping), Admin. R. Pub. Doc. 461 ("Final Determination") and accompanying unpublished Issues and Decision Memorandum, A-570-943, POI 10/1/08 – 3/31/09 (Apr. 13, 2010), Admin. R. Pub. Doc. 459, available at http://ia.ita.doc.gov/frn/summary/PRC/2010-8994-1.pdf (last visited October 9, 2012) ("I & D Mem.") (adopted in the Final Determination, 75 Fed. Reg. at 20,336).

calculated for the China-wide entity, rather than assigning to Changbao a separate rate based at least in part on information it submitted. See Mem. Supp. Pls.' Mot. for J. on Agency R. under Rule 56.2, ECF No. 63 ("Pls.' Br.").[2]  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2006),[3] and 28 U.S.C. § 1581(c) (2006).

As explained below, Commerce reasonably determined to disregard Changbao's separate rate application as unreliable.

_____

[2] Plaintiffs' brief discusses additional matters that are no longer before the court in this action. See Order (Aug. 31, 2011) ECF No. 80.  This opinion does not address those matters.

Also pending is Defendant-Intervenors' TMK IPSCO, V&M Star L.P., Evraz Rocky Mountain Steel, and the United Steelworkers motion pursuant to USCIT Rule 11, for sanctions against Changbao and its present counsel. See Mot. for Sanctions, ECF No. 108. Defendant-Intervenors argue that, because Changbao admitted to deceiving Commerce during verification, it has no colorable argument that Commerce's rejection of Changbao's submissions, when calculating Changbao's dumping margin, was not supported by substantial evidence. Id.

Upon due consideration of Defendant-Intervenors' motion, Changbao's response thereto, and the administrative record of this proceeding, the motion for sanctions is denied.  In the circumstances presented, Changbao's challenge to Commerce's decision to reject all of Changbao's data is not so frivolous as to warrant sanctions. See, e.g., Since Hardware (Guangzhou) Co. v. United States, No. 09-00123, 2010 WL 3982277 (CIT Sept. 27, 2010) (remanding Commerce's decision to reject the totality of a respondent's submissions, notwithstanding the fact that this respondent had intentionally deceived Commerce in some of its submissions).

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

Commerce reached this determination based on findings that neither Changbao nor its computer accounting software could be relied upon to furnish truthful and accurate information. These findings reflected Changbao's eleventh-hour revelation that it maintained two contradictory sets of certain records and concealed this fact when Commerce examined Changbao's accounting software. Because these findings are supported by a reasonable reading of the record, the court sustains Commerce's Final Determination.

## BACKGROUND

When investigating imports from China, Commerce employs a methodology specific to non-market economies ("Commerce's NME methodology"). Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002). One aspect of Commerce's NME methodology is that exporters are presumed to operate under government control (the "presumption of government control") and must submit reliable evidence to the contrary in order to receive an antidumping duty rate that is separate from the countrywide entity ("separate rate status"). Id. (citing Sigma Corp. v. United States, 117 F.3d 1401 (Fed. Cir. 1997)). Here Plaintiffs are challenging Commerce's decision to disregard as unreliable the totality of Changbao's submissions in this investigation, including in particular submissions in support of

Changbao's application for separate rate status. See Pls.' Br.;

Final Determination, 75 Fed. Reg. at 20,339.

Commerce's unreliability determinations with regard to

Changbao were based on the discovery that Changbao had willfully

deceived Commerce when submitting its factors of production

data.[4]  Changbao had initially reported using both alloy and non-

alloy steel billets to produce the subject merchandise,[5] but

subsequently recanted these submissions, contending that, during

the period of investigation ("POI"), Changbao used alloy billets

exclusively. Changbao Mem. at 3 (citing Changbao's Pre-

Preliminary Cmts., A-570-943, POI 08-09 (Oct. 28, 2009), Admin.

R. Con. Doc. 143 [Pub. Doc. 306], at 2 n.2).  Preliminarily

accepting Changbao's separate rate application, Commerce

responded to Changbao's FOP submission by tentatively valuing

---

[4] Absent certain exceptions not applicable here, the normal value
of NME merchandise is generally determined based on the value of
the factors of production ("FOP") utilized in producing such
merchandise in a surrogate market economy. See 19 U.S.C.
§ 1677b(c).

[5] Memorandum Re Application of Total Adverse Facts Available for
[Changbao] in the Antidumping Duty Investigation of [OCTG] from
[China], Admin. R. Con. Doc. 219 [Pub. Doc. 456] (Apr. 8, 2010)
("Changbao Mem.") (incorporated by reference in the Final
Determination, 75 Fed. Reg. at 20,337, and in the I & D Mem.
Cmt. 30 at n. 416) at 3 (citing Ex. 3 to Changbao's Cmts. re
Surrogate Values, A-570-943, POI 08-09 (Sept. 11, 2009), Admin.
R. Con. Doc. [Pub. Doc. 262] and Changbao's Resp. to Pet'rs'
Cmts. re Surrogate Values (Sept. 18, 2009) at 2).

Changbao's billets exclusively as alloy billets, but noted that it "intend[ed] to pursue this issue at verification".[6]

During verification, Changbao provided Commerce with certain mill test certificates ("MTCs") to support the chemical composition that Changbao claimed for its billets, and Commerce compared these hardcopy MTCs to the versions maintained in Changbao's computer accounting system.[7]  When questioned regarding apparent discrepancies between the MTCs provided to Commerce during verification and documents accompanying U.S. entries of Changbao's subject merchandise during the POI, Changbao denied having any relevant knowledge beyond the fact that Changbao's customers, not Changbao, generally complete entry documents. Changbao Mem. at 4 (citing Changbao Verif. Rep. at 29).

After verification, however, Defendant-Intervenors TMK IPSCO, V&M Star L.P., Wheatland Tube Corp., Evraz Rocky Mountain

---

[6] Certain Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg. 59,117, 59,129 (Dep't Commerce Nov. 17, 2009) (notice of preliminary determination of sales at less than fair value, affirmative preliminary determination of critical circumstances and postponement of final determination) ("Preliminary Determination").

[7] Changbao Mem. at 3-4 (citing Verification Report of the Sales & Factors of Production Responses of [Changbao] in the Antidumping Duty Investigation of [OCTG] from [China], A-570-943, POI 08-09 (Feb. 16, 2010), Admin. R. Con. Doc. 181 [Pub. Doc. 385] ("Changbao Ver. Rep.") at 25-26 and Exs. 8, 11, 12, 23, 26, 31 and 41).

Steel, and the United Steel Workers ("Petitioners") sought "to rebut the authenticity of the MTCs placed on the record by Changbao and statements made by Changbao officials during the verification." Changbao Mem. at 4 (citing Rebuttal Cmts. Re Changbao Verif. Rep., A-570-943, POI 08-09 (Feb. 22, 2010), Admin. R. Con. Doc. 183 [Pub. Doc. 390] ("Pet'rs' Cmts. Re Changbao Verif.")).  Petitioners' submission included an MTC that TMK claimed accompanied OCTG produced by Changbao and imported into the United States. Id.  This MTC was issued for OCTG imported shortly before the POI and corresponded to a steel grade reviewed at Changbao's verification (grade "K55"), but, unlike the MTCs provided by Changbao to Commerce during verification, this MTC "did not contain the requisite levels of manganese, vanadium, or boron to qualify the OCTG as alloy steel." Id.; see Pet'rs' Cmts. Re Changbao Verif. at 2.  In addition to this MTC, Petitioners' submission also included an affidavit affirming that the OCTG in question was analyzed and that it was determined that this OCTG was non-alloy steel. Id. Petitioners therefore asserted that Changbao's representations to Commerce to the contrary were fraudulent. Id.

        Changbao responded to Petitioners' allegations of fraud by submitting "all grade K55 OCTG laboratory test reports corresponding to all customers, in all markets for the [POI],"

contending that, contrary to the MTC submitted by the Petitioners, all of Changbao's K55 OCTG during this period contained the requisite levels of boron to qualify the OCTG as alloy steel. Id. at 4-5 (citing Exs. 1 and 2 to Changbao's Rebuttal to Pet'rs' Feb. 22, 2010 Cmts., A-570-943, POI 08-09 (Mar. 4, 2010), Admin. R. Con. Doc. 192 [Pub. Doc. 414]).

Seeking clarification, Commerce requested from U.S. Customs and Border Protection ("Customs"), and placed on the record, certain data pertaining to imports of Changbao's subject merchandise during the POI, including "MTCs for three of Changbao's sales of subject merchandise during the POI." Changbao Mem. at 5; see Release of [Customs] Information, A-570-943, POI 08-09 (Mar. 9, 2010), Admin. R. Con. Doc. 199 [Pub. Doc. 422] ("Customs Data"). One of the MTCs that Commerce received from Customs corresponded to a U.S. sale that Commerce had reviewed during Changbao's verification. Changbao Mem. at 5. With regard to this sale, a comparison of the MTC received from Customs and the MTC provided by Changbao "demonstrated discrepancies between the two MTCs." Id. (citing Ex. 8 to Changbao Verif. Rep.); see also Customs Data. Specifically, the MTC received from Customs indicated that the imported OCTG was produced from non-alloy steel, not alloy steel as Changbao had

reported to Commerce. Id.[8]  In addition, the remaining two MTCs

received from Customs for Changbao's sales of subject

merchandise during the POI also indicated use of non-alloy

steel. Id.

Responding to Commerce's release of this new

information from Customs, Changbao admitted that, contrary to

its representations during verification, Changbao was in fact

aware of material discrepancies between the MTCs submitted to

Commerce and those accompanying Changbao's subject entries, and

Changbao also knew how these discrepancies were created. See

Changbao's Cmts. on [Customs] Data, A-570-943, POI 08-09 (Mar.

11, 2010), Admin. R. Con. Doc. 203 [Pub. Doc. 429] ("Changbao's

Mar. 11 Cmts.").[9]  Counsel for Changbao argued that "[t]hough

[Changbao's] practice [in this regard] is regrettable, it does

not contradict [Commerce]'s verification findings regarding the

[composition] of Changbao's billets." Id. at 6.  Changbao also

_____

[8] In particular, the MTC received from Customs demonstrated
[[
      ]]. Id.

[9] Changbao contended that "the discrepancies with the [MTCs
obtained from Customs] arise from Changbao having [[


                              ]]." Id. at 2; see also id. at 6 ¶5
(titled "Manual Adjustment of Mill Certificates Issued to
Customers to Protect Trade Secrets").

suggested that the issue of Changbao's actual billet composition be resolved by Commerce conducting its own independent and party-neutral analysis of Changbao's OCTG. See id. at 7.

Commerce disagreed, finding instead that the nature and timing of Changbao's admission implicated the overall credibility of Changbao officials, as well as the reliability of Changbao's computer accounting software, which had corroborated Changbao's material misrepresentations during verification. See Changbao Mem. at 11-12.  Commerce found Changbao's explanation – referring to a concern for protecting Changbao's commercially-sensitive trade secrets – unsatisfactory, because Changbao should have known that all business proprietary information would be protected by the investigation's administrative protective order. See id. at 9.  Finding that no additional verification could reasonably be accomplished within the applicable deadlines for completing the investigation, Commerce invoked its authority under 19 U.S.C. §§ 1677e(a) and 1677m(d) to disregard the totality of Changbao's unreliable and unverifiable submissions. See id. at 11-12.

The totality of responses that Commerce disregarded included Changbao's application for an antidumping duty rate separate from the China-wide entity. Final Determination, 75 Fed. Reg. at 20,339; Changbao Mem. at 13-14.  Having

disregarded Changbao's separate rate application as unreliable,
Commerce found that Changbao had failed to submit credible
evidence sufficient to rebut the presumption of government
control, and thus determined to treat Changbao as part of the
China-wide entity for purposes of this investigation. Id.
Commerce therefore assigned to Changbao the 99.14 percent
antidumping duty rate calculated for the China-wide entity.
Final Determination, 75 Fed. Reg. at 20,341.[10]  Plaintiffs
contend that Commerce instead should have assessed a separate
rate for Changbao, based at least in part on data submitted by
Changbao. Pls.' Br.

## STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations
under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c),
this Court sustains Commerce's determinations, findings, or

---

[10] The China-wide rate was calculated based on an adverse
inference that was not specific to Changbao, but rather was
based on the China-wide entity's own failure to respond to
questionnaires. Preliminary Determination, 74 Fed. Reg.
at 59,124-25.  This rate was corroborated with respect to the
China-wide entity as a whole. Final Determination, 75 Fed. Reg.
at 20,339-40.  Plaintiffs do not address the methodology or
evidence used in Commerce's calculation of the China-wide rate
in this investigation. See Pls.' Br.; cf. Watanabe Gr. v. United
States, No. 09-00520, 2010 WL 5371606, at *4 (CIT Dec. 22, 2010)
(addressing a challenge to Commerce's corroboration of the
chosen China-wide rate).  Accordingly, Commerce's selection of
this China-wide rate – as opposed to the application of this
rate to Changbao – is not at issue in this proceeding.

conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)).

**DISCUSSION**

Pursuant to the antidumping statute, Commerce is authorized to disregard a respondent's submissions in favor of facts otherwise available ("FA") if Commerce finds that the respondent withheld information; failed to provide information within applicable deadlines and in the form and manner requested; submitted information that could not be verified; or otherwise impeded the investigation; and then failed to adequately explain or remedy the deficiency. 19 U.S.C. §§ 1677e(a)(2) (deficiency), 1677m(d) (remedy).  Where the deficiency identified under Section 1677e(a)(2) affects discrete areas of the administrative record, Commerce may use FA to fill these "gaps in the record." Uruguay Round Agreements Act Statement of Administrative Action, H.R. Rep. No. 103-316,

at 869-70 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99 ("SAA"). On the other hand, where the deficiency affects the reliability of all or most of a respondent's submissions, Commerce may disregard the totality in favor of FA. Shanghai Taoen Int'l Trading Co. v. United States, 29 CIT 189, 199 n.13, 360 F. Supp. 2d 1339, 1348 n.13 (2005). Commerce may not, however, decline to consider any submission that, though partially deficient, satisfies all of the criteria listed in Section 1677m(e) – i.e., Commerce must give consideration to submissions which 1) were submitted by the established deadline; 2) can be verified; 3) are not so incomplete that they are unreliable; 4) are submitted by a party who has demonstrated that it acted to the best of its ability in providing the information and meeting the established requirements; and 5) can be used without undue difficulties. 19 U.S.C. § 1677m(e).

Once Commerce determines that the conditions established by subsections 1677e(a), 1677m(d) and 1677m(e) are met and that resort to FA is appropriate, Commerce may employ an adverse inference when selecting among the facts available if it further determines that the respondent failed to cooperate by not acting to the best of its ability to comply with Commerce's

requests for information. 19 U.S.C. § 1677e(b) (the "adverse inference" provision).[11]

In this case, Commerce invoked all four of Section 1677e(a)(2)'s alternate prerequisites for authorization to discard Changbao's responses in favor of FA.  Commerce found that Changbao withheld information; failed to provide information in a timely manner and in the form and manner requested; submitted information that could not be verified; and otherwise impeded the investigation. Changbao Mem. at 8-11. These findings were all based on Changbao's late admission that Changbao officials had lied to Commerce during verification and failed to disclose the existence of Changbao's dual record-keeping system. Id.; see Changbao's Mar. 11 Cmts. at 6-7. Commerce found that the nature and timing of Changbao's deception impeached the credibility of Changbao officials, as well as the reliability of the accounting software examined during verification. Changbao Mem. at 11.  Finding Changbao's explanation for the deficiency not credible and Changbao's

---

[11] The adverse inference provision, however, may be invoked only when selecting from among the facts available, not when deciding whether resort to FA is necessary. 19 U.S.C. § 1677e(a) and (b); Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011) ("Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference.").  When the adverse inference provision is invoked, Commerce selects adverse facts available ("AFA") to make its determination. 19 U.S.C. § 1677e(b).

proposed remedy impractical, Commerce invoked its authority
under Sections 1677e(a) and 1677m(d) to disregard the totality
of Changbao's submissions in this investigation as unreliable.
See id. at 9, 11.  In addition, finding that none of Changbao's
submissions could be verified without undue difficulty, Commerce
concluded that Section 1677m(e) was not applicable. See id.
at 10, 11.  Finally, Commerce invoked the adverse inference
provision to further support its decision to disregard
Changbao's responses. Id. at 12-14.  The totality of responses
disregarded by Commerce included Changbao's application for a
rate separate from the countrywide entity. Id. at 13-14; Final
Determination, 75 Fed. Reg. at 20,339.

Prior to invoking the adverse inference provision,
Commerce explained that its decision to disregard Changbao's
responses was based on its findings that neither Changbao nor
its computerized record-keeping system could be relied on to
provide truthful and accurate information. Changbao Mem. at 11-
12.  Commerce therefore found that Changbao had failed to submit
credible evidence sufficient to rebut the presumption of
government control, and thus determined to treat Changbao as
part of the China-wide entity for purposes of this
investigation. Id. at 13-14; see Transcom, 294 F.3d at 1373
(explaining that the presumption of government control applies

to NME respondents in the absence of reliable rebutting

evidence) (citing Sigma, 117 F.3d at 1405-06 (upholding

application of presumption of government control to NME

respondents)).[12]

_____

[12] In its Issues and Decision Memorandum, Commerce stated that it was invoking the adverse inference provision with regard to the China-wide entity based on a finding that Changbao failed to cooperate in this investigation. See I & D Mem. cmt. 30 ("[W]e find that Changbao is part of the PRC-wide entity for purposes of this investigation. . . . Accordingly, [Commerce] must now apply adverse facts available to the PRC entity, which includes Changbao."). This statement is incorrect. Rather, as Commerce explained in the Final Determination, the China-wide rate had been calculated based on an adverse inference employed in the Preliminary Determination, and the Final Determination had left this rate unchanged. Final Determination, 75 Fed. Reg. at 20,339. As the Preliminary Determination was issued before Commerce determined to disregard all of Changbao's submissions, the China-wide rate was calculated while Changbao still enjoyed tentative separate rate status. See Preliminary Determination, 74 Fed. Reg. at 59,124-25 and 59,129-30. Then, after the evidentiary support for Changbao's separate rate status had been invalidated and Commerce determined to treat Changbao as part of the China-wide entity, Commerce simply applied the rate already calculated for that entity to Changbao. Final Determination, 75 Fed. Reg. at 20,339-41. Therefore it is confusing to imply, as the Issues and Decision Memorandum does, that Changbao's behavior in this investigation had anything to do with how the China-wide rate was calculated. Nevertheless, this misstatement is not pertinent because the issue is corrected in the Final Determination. Id. at 20,339. As explained in the Final Determination, Commerce did not invoke the adverse inference provision to calculate Changbao's margin. Rather, Commerce determined that, based on the presumption of government control operating in the absence of credible evidence to the contrary, Changbao was not entitled to a separate rate. Id. Commerce therefore did not calculate a separate dumping margin for Changbao, but rather assigned to Changbao the rate calculated for the China-wide entity. Id.

Plaintiffs challenge Commerce's determination to apply to Changbao the antidumping duty cash deposit rate that was calculated for the China-wide entity, contending that the findings on which Commerce based its decision to disregard Changbao's separate rate application were not supported by substantial evidence. See Pls.' Br.  Specifically, Plaintiffs take issue with Commerce's findings that I) Changbao withheld information, Changbao Mem. at 8-9; see 19 U.S.C. § 1677e(a)(2)(A); II) the scope of this deficiency, within the meaning of Sections 1677e(a)(2) and 1677m(d), extended to all of Changbao's representations, submissions, and databases examined at verification, including the proffered evidentiary support for Changbao's separate rate application, Changbao Mem. at 11, 13; III) Changbao failed to credibly explain and adequately remedy the deficiency, Changbao Mem. at 9; see 19 U.S.C. § 1677m(d); IV) none of Changbao's submissions could be verified without undue difficulty, Changbao Mem. at 11; see 19 U.S.C. § 1677m(e); V) Changbao failed to cooperate in this investigation, Changbao Mem. at 12-14, see 19 U.S.C. § 1677e(b); and VI) a presumption of government control, and with it the China-wide rate, applied to Changbao, Changbao Mem. at 14.

For the reasons explained below, the court sustains each challenged finding.  Taken together, these findings provide

sufficient support for Commerce's decision to disregard

Changbao's separate rate application and apply to Changbao the

China-wide rate pursuant to the presumption of government

control. See 19 U.S.C. §§ 1677e(a)(2), 1677m(d), 1677m(e);

Transcom, 294 F.3d at 1373. The court considers each finding in

turn.

I.    Commerce's Determination that Changbao Withheld
      Information Requested of It

        The first issue concerns Commerce's determination that

Changbao withheld information requested of it in this

investigation. Final Determination, 75 Fed. Reg. at 20,339;

see Pls.' Br. at 14-18. Commerce explained that its

determination was based on Changbao's admission that it

intentionally deceived Commerce officials during verification

and failed to disclose the existence of Changbao's dual record-

keeping system. See Changbao Mem. 8-10. Commerce emphasized

that "[a]t no point during the verification, or in any of its

submissions to [Commerce] (until after release of the [Customs]

data) did Changbao acknowledge that it maintained two versions

of its OCTG-related MTCs," id. at 9, even when Commerce

specifically asked Changbao to explain why its statements

concerning the subject merchandise's chemical properties

appeared to diverge from documentation accompanying Changbao's

subject merchandise during the POI. Id. (citing Changbao Verif. Rep. at 29 and Ex. 8).

Although, contrary to Changbao's representations, the certificates that Changbao provided to Commerce at verification did not in fact accompany any subject merchandise during the POI, Changbao argues that no information was withheld because the provided certificates nevertheless accurately reflected the chemical composition of the subject merchandise. Pls.' Br. at 15.  But Changbao's argument misses the point.  What Changbao withheld from Commerce was its undisclosed maintenance of – and so its willingness and ability to maintain and conceal – at least two materially different sets of the same records.[13] Changbao Mem. at 9.

It was reasonable for Commerce to determine that Changbao withheld information requested of it when Commerce discovered that Changbao officials had lied during verification, claiming that the mill test certificates provided to verifying officials were those that accompanied the invoices of sales under investigation, while knowing that this was not true. Changbao Mem. at 9; Changbao Verif. Rep. at 29. Cf., e.g., Universal Polybag Co. v. United States, 32 CIT 904, 913,

---

[13] Changbao also withheld its willingness and ability to
[[                           ]]. See Changbao's Mar. 11 Cmts.

577 F. Supp. 2d 1284, 1294 (2008) (holding that Commerce reasonably found that a respondent withheld information requested of it where the respondent represented that a report was unchanged from its prior version while knowing that the report contained undisclosed corrections). Commerce's finding that Changbao withheld information within the meaning of 19 U.S.C. § 1677e(a)(2)(A) is therefore sustained.

   II.   Commerce's Determination that Deficiency Implicated the Totality of Changbao's Submissions

        Next, Plaintiffs challenge Commerce's determination that the information withheld by Changbao implicated the credibility and reliability of all of Changbao's submissions in this investigation, including the credibility of all Changbao officials questioned and the reliability of all records examined during verification. Pls.' Br. at 20-24.

        Commerce found that the extent of Changbao's deception during verification impeached Changbao's overall credibility because "not only did Changbao not divulge the existence of the two . . . contradictory [sets of] MTCs, at verification, it actively substituted one set of MTCs for another and, then, directly misrepresented the nature of the information it was providing to [Commerce]." Changbao Mem. at 11. Given these circumstances, Commerce found that Changbao officials were not reliable sources of truthful and accurate information. Id.

Further, because Commerce's review of Changbao's electronic record-keeping system during verification had also failed to disclose that Changbao maintains two contradictory sets of MTCs, Commerce additionally concluded that "the veracity of the remaining information [that Commerce] viewed at verification [and] that was based on this electronic data system" had also been impeached. Id.  Thus, Commerce emphasized that Changbao 1) failed to disclose that Changbao maintains two different sets of mill test certificates; 2) substituted one set of certificates for another and intentionally lied to Commerce about the nature of the certificates; 3) failed to disclose that the accounting software examined during verification corroborated Changbao's misrepresentations and did not reveal the existence of a dual record-keeping system; and 4) failed to apprise Commerce of these factual circumstances until Commerce itself placed evidence on the record tending to contradict Changbao's representations during verification. Id.  Given these circumstances, Commerce determined that the credibility of Changbao officials and the reliability of records examined at verification had been called into question. Id.

It is reasonable for Commerce to infer that a respondent who admits to having intentionally deceived Commerce officials, and does so only after Commerce itself supplies

contradictory evidence, exhibits behavior suggestive of a general willingness and ability to deceive and cover up the deception until exposure becomes absolutely necessary. Here, Commerce determined that, in the absence of additional reassurance or an explanation sufficient to rehabilitate Changbao's damaged credibility, Commerce had no way of knowing whether or not Changbao may have been less than straightforward with regard also to its remaining submissions and representations in this investigation. See Changbao Mem. at 11. In addition, as with Changbao's written and oral representations, Changbao's evident willingness and ability to engineer an electronic record-keeping system that corroborates its misrepresentations, and to conceal this fact from Commerce until confronted with contradictory evidence, id., supports a reasonable inference that the information previously verified using this electronic database was also no longer reliable.

        In sum, the inference that a respondent's failure to disclose willful deception until faced with contradictory evidence implicates the reliability of that respondent's remaining representations is reasonable. See Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13. Given that inference, Commerce's determination that a deficiency in credibility affected the totality of Changbao's submissions was

supported by the record.  Accordingly, this determination is sustained.

   III. Commerce's Determination that Changbao's Explanation Was
        Not Credible and Changbao's Proposed Remedy Was
        Impractical

        Next, Changbao challenges Commerce's finding that Changbao failed to credibly explain and adequately remedy the deficiency, within the meaning of Section 1677m(d). See Pls.' Br. 18-20. Although the circumstances on which Commerce's credibility findings were based did not come to light until months after verification, and only about a month before publication of Commerce's Final Determination, see Changbao Mem. at 9, 11; Changbao's Mar. 11 Cmts, Commerce provided Changbao with an opportunity to rehabilitate its impeached credibility and/or provide a credible explanation to rehabilitate the impeached credibility of its accounting software, notwithstanding the time constraint. See Changbao Mem. at 5.

        Changbao's explanation for deceiving Commerce officials and covering up the deception until Commerce itself placed contradictory evidence on the record referred to Changbao's need to protect commercially-sensitive trade secrets.[14]  Commerce reasonably found this explanation

_____

[14] Changbao's explanation was that the certificates provided to Changbao's customers, which accompanied Changbao's subject merchandise into the United States, [[

                                            (footnote continued)

unsatisfactory, because Changbao did not need to lie to Commerce to protect its trade secrets when all business proprietary information would have been protected under the investigation's administrative protective order. Changbao Mem. at 9.

Changbao's attempt to remedy the situation involved the submission of additional laboratory test results and a proposal that Commerce arrange for testing of Changbao's merchandise by a neutral laboratory. Changbao's Mar. 11 Cmts. at 7 ¶7; Changbao Mem. at 5-6. Given the late hour of these new submissions and the time limits for Commerce's completion of antidumping investigations, however, Commerce reasonably determined that Changbao's proposed remedy was not practicable. See Changbao Mem. at 10-11; 19 U.S.C. § 1677m(d); see also SAA at 865 ("[Section 1677m(d)] is not intended . . . to allow parties to submit . . . information that cannot be evaluated adequately within the applicable deadlines.").

---

]], whereas the certificates that Changbao provided to Commerce accurately reflected the chemical composition of Changbao's steel billets. Changbao's Mar. 11 Cmts. at 6 ¶5 (titled "Manual Adjustment of Mill Certificates Issued to Customers to Protect Trade Secrets") and Ex. 1 (Decl. of Lanyong Zhang). Charitably read, Changbao's explanation for withholding this information and instead lying to Commerce officials during verification was that Changbao did not wish to divulge any trade secrets. See Changbao Mem. at 9; see also Pls.' Br. at 15 ("[T]he discrepancy was due to [Changbao's] attempt to protect its trade secrets . . . .").

Commerce articulated a reasonable basis for concluding that Changbao withheld information and then failed to adequately explain and remedy the deficiency.  Because these findings are sufficient to satisfy the statutory requirements for using FA, the court need not and does not examine Commerce's alternate grounds for relying on FA with regard to Changbao. See 19 U.S.C. §§ 1677e(a)(2) and 1677m(d).

IV.  Commerce's Determination that None of Changbao's Submissions Could Be Verified or Used Without Undue Difficulties

Although resort to FA may be justified based on deficiencies identified under subsection 1677e(a)(2), Commerce may not decline to consider submissions that, though deficient, satisfy all five of the criteria listed in subsection 1677m(e). 19 U.S.C. § 1677m(e).  The criteria listed in subsection 1677m(e) include the requirements that the submissions at issue be verifiable and can be used without undue difficulties. 19 U.S.C. § 1677m(e)(2) and (5).

Plaintiffs challenge Commerce's finding that none of Changbao's deficient submissions could be verified or used without undue difficulties. See Changbao Mem. at 10-11; Pls.' Br. at 15-20.  Commerce found that none of Changbao's submissions could be verified or used without undue difficulties because the information withheld by Changbao was not disclosed

until additional verification could not reasonably be accomplished within the deadline for completing this investigation. Changbao Mem. at 10-11. Because the information withheld by Changbao implicated the credibility of all Changbao's submissions and the reliability of all records examined at verification, Commerce determined that all of Changbao's submissions required additional verification, but that additional verification was impractical so late in the proceeding. Id. As already concluded, *supra* subsection III, this determination was reasonable.

Plaintiffs disclaim any responsibility for delaying the discovery that additional verification was necessary. See Pls.' Br. at 18-19. They contend that if Commerce had not accepted Petitioners' submissions challenging the veracity of Changbao's representations at verification, then no additional verification would have been necessary. Id. Plaintiffs' argument again misses the point. The reason behind Commerce's determination that none of Changbao's submissions were credible in the absence of additional verification was that Changbao had failed to disclose misrepresentations to Commerce, and had concealed from Commerce the existence of a dual record-keeping system. Changbao Mem. at 9-12. Changbao was at all times in possession of this information but chose not to disclose it

until confronted with contradictory evidence which Commerce itself obtained and placed on record. Id. Thus Changbao cannot claim unfair disadvantage from the late hour of the discovery that additional verification was necessary to support the credibility of its submissions.

Commerce's determinations that 1) the discovery of Changbao's deceptive acts at verification invalidated the results of such verification, and 2) additional verification was impractical once this discovery was made, are supported by a reasonable reading of the record. The conclusion that none of Changbao's submissions could reasonably be verified within the applicable deadline logically follows. Commerce's determination that none of Changbao's submissions meet the verifiability requirement of subsection 1677m(e) is therefore sustained.

   V.   Commerce's Finding that Changbao Failed to Cooperate to
        the Best of its Ability

Commerce next found, invoking 19 U.S.C. § 1677e(b), that Changbao failed to cooperate in this investigation. Changbao Mem. at 12. Section 1677e(b) permits the use of "an inference that is adverse to the interests of [a] party in selecting from among the facts otherwise available" if Commerce "finds that [the] interested party has failed to cooperate by not acting to the best of its ability to comply with [Commerce's] request for information." 19 U.S.C. § 1677e(b).

"Compliance with the 'best of its ability' standard is determined by assessing whether [the] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Here, a reasonable reading of the record supports Commerce's conclusion that, by deceiving Commerce at verification and using its accounting software to cover up its deception, Changbao failed to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in [this] investigation." Nippon Steel, 337 F.3d at 1382; see Changbao Mem. at 11-13; Changbao Verif. Rep. at 6-9, 29; Changbao Mar. 11 Cmts. Commerce's determination that Changbao failed to cooperate in this investigation is therefore supported by substantial evidence, and is accordingly affirmed.

Based on its findings that 1) resort to FA was warranted with regard to all information necessary to calculate Changbao's dumping margin and 2) that Changbao failed to cooperate in this investigation, Commerce could have chosen to calculate a separate rate for Changbao based entirely on AFA. See 19 U.S.C. § 1677e. Defendant-Intervenor Maverick Tube Corporation suggests that, on the record of this investigation, such a separate AFA rate for Changbao may have resulted in an

antidumping duty rate that was well above 200 percent.
See Maverick Br., ECF Nos. 85 (public) and 86 (confidential) at
31-36.  The court need not reach this issue, however, because,
instead, Commerce chose to apply to Changbao the presumption of
government control. Changbao Mem. at 13-14.  Finding Changbao's
separate rate application and its supporting evidence to be
unreliable, Commerce determined that Changbao had failed to
rebut this presumption and was therefore subject to the China-
wide rate. See id.

As explained in the following two subsections,
Commerce's determination that Changbao's separate rate
application was unreliable is sustained because this
determination is supported by substantial evidence (*infra*
subsection VI), and Commerce's application of the presumption of
government control has previously been sustained by the Court of
Appeals (*infra* subsection VII).

   VI.  Changbao's Separate Rate Application

Commerce made two critical findings affecting
Changbao's application for a rate separate from that calculated
for the China-wide entity in this investigation.  First,
Commerce found that, by lying during verification, Changbao
officials revealed themselves to be not credible. See Changbao
Mem. at 9-11; Changbao Verif. Rep. at 29; Changbao's Mar. 11

Cmts.  The logical implication of this finding is that record evidence consisting solely of representations made by Changbao is, in the absence of independent supporting evidence, unreliable.  Second, Commerce found that Changbao's [[   ]] computer software – which electronically maintains all of Changbao's accounting records, including those used to verify Changbao's separate rate application[15] – corroborated Changbao's material misrepresentations.  See Changbao Mem. at 11; Changbao Verif. Rep. at 29.  The reasonable implication of this second finding is that Changbao's accounting software is not a reliable source of independent supporting evidence.

Thus, to the extent that Changbao's separate rate application contained solely representations made by Changbao, and was supported solely by documentation generated by Changbao's accounting software, Commerce's conclusion that Changbao's separate rate application had been invalidated follows logically from Commerce's unreliability findings with regard to Changbao and its accounting software.  As the record of this proceeding supports both unreliability findings, see Changbao Verif. Rep. at 9, 29; Changbao's Mar. 11 Cmts; Changbao Mem. at 9-11, and as Changbao has not pointed to any

---

[15] See Changbao Verif. Rep. at 6-9.

independent record evidence other than its representations and its accounting software,[16] Commerce reasonably concluded in its <u>Final Determination</u> that Changbao's separate rate application should be denied.

Plaintiffs' reference to this Court's reasoning in <u>Since Hardware (Guangzhou) Co. v. United States</u>, No. 09-00123, 2010 WL 3982277 (CIT Sept. 27, 2010) to suggest the contrary is misplaced. <u>See</u> Pls.' Br. at 24.  <u>Since Hardware</u> held that remand was warranted where Commerce "made no specific finding that the responses concerning state control were inaccurate." <u>Since Hardware</u>, 2010 WL 3982277, at *5.  Here, on the other hand, Commerce made specific findings that Changbao's submissions regarding government control were not credible and that the accounting software which generated the documents examined in verifying those submissions was unreliable. <u>Changbao Mem.</u> at 11, 13-14.  <u>Since Hardware</u> is therefore inapposite.

Any other contrary prior holdings on this subject are also not applicable here.  The court has repeatedly held, for

---

[16] <u>See</u> Pls.'s Br. at 24-25 (arguing that Changbao's separate rate representations were independently verified by Commerce, but citing to Commerce's verification of databases generated by Changbao's unreliable accounting software); <u>Changbao Verif. Rep.</u> at 9 (noting that all Changbao accounting record-keeping is done through the [[    ]] accounting software); <u>id.</u> at 29 (noting that the [[    ]] accounting software fully corroborated information which Changbao later admitted to be materially incorrect).

example, that an NME respondent's separate rate application may not be disregarded in favor of the presumption of government control in the absence of specific evidentiary findings to support the conclusion that such an application presents no reliable evidence.  In Gerber and Shandong Huarong, for example, unlike the present case, Commerce had first specifically found that the respondents' misrepresentations did not affect their separate rate status, and then subsequently changed course without any intervening record evidence on which to base a determination to the contrary.[17]  The court held that, "[h]aving made such favorable findings concerning the accuracy and suitability of the submitted information needed to calculate [individual] assessment rates, and having failed to support with substantial evidence any later findings to the contrary, Commerce may not refuse to consider that information." Gerber, 29 CIT at 766-67, 387 F. Supp. 2d at 1283; see also Shandong Huarong, 27 CIT at 1594-95.  Here, on the other hand, as discussed above, Commerce made two critical findings, supported by the record, that specifically affected Changbao's separate rate application – the finding that Changbao's representations

---

[17] Gerber Food (Yunan) Co. v. United States, 29 CIT 753, 766-67, 387 F. Supp. 2d 1270, 1282-83 (2005); Shandong Huarong Gen. Gr. Corp. v. United States, 27 CIT 1568, 1594-95 (2003) (not reported in the Federal Supplement).

are unreliable in the absence of independent supporting

evidence, and the finding that Changbao's accounting software is

not a reliable source of independent evidence.  Unlike Gerber

and Shandong Huarong, therefore, Commerce did not fail in this

case to make a reasonable determination to disregard Changbao's

separate rate application.

This action is also distinguishable from prior

holdings that Commerce may not disregard an NME respondent's

separate rate application based solely on an adverse inference.

E.g., Gerber, 29 CIT at 772-73, 387 F. Supp. 2d at 1288; Foshan

Shunde Yongjian Housewares & Hardware Co. v. United States,

No. 10-00059, 2011 WL 4829947, at *16-17 (CIT Oct. 12, 2011).

These prior holdings emphasize that where Commerce has made no

finding that responses concerning government control are

deficient, it is contrary to law for Commerce to apply an

adverse inference to disregard separate rate applications,

because a finding of deficiency is an antecedent requirement to

Commerce's application of an adverse inference.[18]  Here, on the

---

[18] Gerber, 29 CIT at 775, 387 F. Supp. 2d at 1290 ("Neither the 'adverse inferences' provision of 19 U.S.C. § 1677e(b) nor the general authority granted by the antidumping laws empowers Commerce to assign punitive antidumping duty assessment rates that are unsupported by record evidence and contrary to facts Commerce found in its own review proceeding."); Foshan Shunde, 2011 WL 4829947 at *17 (quoting Zhejiang DunAn, 652 F.3d at 1346
(footnote continued)

other hand, Commerce did not base its decision to disregard
Changbao's separate rate application solely upon an adverse
inference.  Rather, having found that Changbao's separate rate
application consisted entirely of information derived from
unreliable sources, Commerce disregarded the unreliable
submission.  As the record reasonably supports this
determination, it is affirmed.

   VII. <u>Commerce's Reliance on a Presumption of Government
        Control</u>

        Pursuant to its established and judicially-affirmed
practice, Commerce determined that, in the absence of reliable
rebutting evidence, a presumption of government control applied
to Changbao. <u>Changbao Mem.</u> at 13-14; <u>see</u> <u>Transcom</u>, 294 F.3d
at 1373 ("Under the NME presumption, a company that fails to
demonstrate independence from the NME entity is subject to the
countrywide rate, while a company that demonstrates its
independence is entitled to an individual rate as in a market
economy.") (citing <u>Sigma</u>, 117 F.3d at 1405-06).

        As Commerce has consistently applied it, the
presumption of government control entails a second presumption
that a single countrywide antidumping duty rate is appropriate
for all respondents subject to the AD duty order – i.e., that

("Commerce must first determine that it is proper to use facts
otherwise available before it may apply an adverse inference.").

most companies in NME-designated countries like China do not

engage in independent pricing behavior at all. See Transcom,

294 F.3d at 1373, 1381-82.  This is why the court has accepted,

as a logical consequence of the presumption, Commerce's

application of a countrywide rate to a respondent for whom that

rate had not been individually corroborated.[19]  Simply put,

"Commerce's permissible determination that [a respondent] is

part of the PRC-wide entity means that inquiring into [that

respondent]'s separate sales behavior ceases to be meaningful."

Watanabe Gr. v. United States, No. 09-00520, 2010 WL 5371606,

at *4 (CIT Dec. 22, 2010).

Commerce began employing a presumption of government

control for NME-based respondents (as well as its consequent

presumption that respondents from NME-designated countries are

generally not entitled to individualized antidumping duty rates)

---

[19] See Transcom, 294 F.3d at 1382; Peer Bearing Co. – Changshan v. United States, 32 CIT 1307, 1313, 587 F. Supp. 2d 1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company. It is not directly analogous to the process used in a market economy, where there is no countrywide rate. Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.") (citations omitted); Shandong Mach. Imp. & Exp. Co. v. United States, No. 07-00355, 2009 WL 2017042, at *8 (CIT June 24, 2009) (holding that Commerce has no obligation to corroborate an NME countrywide rate as to an individual party where that party has failed to rebut the presumption of government control).

in 1991,[20] when, it may reasonably be said, economic conditions were generally different from those of the 2008-09 POI at issue here.  In 1997, the Court of Appeals upheld this practice, explaining that "it [is] within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control." Sigma, 117 F.3d at 1405-06 (citing Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995); 19 U.S.C. § 1677(18)(B)(iv), (v); Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information.")).

     After Sigma, Commerce has continued to apply this set of presumptions to all respondents subject to AD duty orders on merchandise from NME-designated countries, and Sigma has continued to be cited as controlling authority for judicial affirmation of Commerce's practice in this regard. See, e.g., Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1372, 1378 (Fed. Cir. 2003); Transcom, 294 F.3d at 1373, 1381-82.  Accordingly, it appears that the issue of Commerce's reliance upon a presumption of government control for

_____

[20] Transcom, 294 F.3d at 1373 (citing two Federal Register notices from 1991).

respondents from NME-designated countries is settled (unless the

Court of Appeals chooses to revisit it[21]).  But see Qingdao Taifa

Gr. v. United States, __ CIT __, 760 F. Supp. 2d 1379, 1384-85

(2010) (holding that Commerce's reliance on a presumption of

government control, without evidence, is incompatible with the

agency's duty to support its decisions with substantial

evidence).

Accepting the reasonableness of Commerce's presumption

of government control for all Chinese respondents has important

implications.  Logically, it implies that most Chinese companies

---

[21] As a practical matter, the reasonableness of presuming, without any affirmative evidence, that all modern Chinese companies are wholly controlled by the Chinese government, such that any inquiry into their individual pricing behavior is completely meaningless, appears open to question.  Perhaps for this reason, this Court has at times found it difficult to square the presumption and its logical implications with Commerce's duty to base its decisions on a reasonable reading of record evidence.  The court has, for example, suggested that applying a countrywide AFA rate to an NME respondent who has failed to demonstrate freedom from government control but for whom Commerce makes no specific finding of a failure to cooperate may be *ultra vires*. East Sea Seafoods LLC v. United States, __ CIT __, 703 F. Supp. 2d 1336, 1354 n.15 (2010); see also Hubbel Power Sys. v. United States, No. 11-00474, 2012 WL 4320481, at *9 (CIT Sept. 20, 2012).  But as losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control, see Watanabe, 2010 WL 5371606, at *4, applying a countrywide AFA rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration. See id.  The core of the unease thus rests with the presumption itself.

are in fact controlled by the Chinese government, such that any inquiry into individual pricing behavior is essentially meaningless absent extraordinary circumstances.  It also implies that if the record contains no evidence of such extraordinary circumstances – or, as here, if the credibility of what was previously deemed to be such evidence has been impeached – then it is reasonable to assume, without evidence, that no further inquiry into individual pricing behavior is necessary.  That is precisely what transpired here: Changbao submitted proof of its independence from government control in the form of attestations backed by statements traceable to its computer accounting software; revelation of Changbao's willful deceptiveness and apparent ability to manipulate its accounting software resulted in findings of non-credibility for Changbao and unreliability for Changbao's accounting software; Changbao's attestations of freedom from government control therefore became not credible and the documents traceable to Changbao's accounting software became unreliable; and, thus, faced with no reliable evidence to the contrary, Commerce presumed that Changbao was controlled by the Chinese government. See Changbao Mem. at 14.  As the reasonableness of employing such a presumption in the absence of reliable rebutting evidence has been repeatedly upheld by the Court of Appeals, e.g., Huaiyin, 322 F.3d at 1378; Transcom,

294 F.3d at 1373, 1381-82, it follows that Commerce acted reasonably here. But see Qingdao, __ CIT at __, 760 F. Supp. 2d at 1384-85.

   VIII.   China-Wide Rate

        Changbao makes no specific objections to the dumping margin calculated for the China-wide entity in this investigation, arguing only that this rate should not have been applied to Changbao. See Pls.' Br. at 24-25.  Accordingly, because Commerce reasonably determined to treat Changbao as part of the China-wide entity, as explained above, and because no party challenges the calculation of the China-wide rate, the 99.14 percent margin calculated for this entity and applied to Changbao is sustained.

## CONCLUSION

        For all of the foregoing reasons, Commerce's Final Determination, 75 Fed. Reg. 20,335, is sustained.  Judgment will be entered accordingly.


                                        __/s/   Donald C. Pogue_____
                                        Donald C. Pogue, Chief Judge


Dated:    November 14, 2012
          New York, New York