Slip Op. 14 - 57

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | |
| Plaintiff, | **PUBLIC VERSION** |
| v. | Before: Donald C. Pogue, Chief Judge |
| UNITED STATES, | Court No. 12-00290[1] |
| Defendant. | |

OPINION

[affirming the Department of Commerce's final results of
antidumping duty administrative review]

Dated: May 27, 2014

Andrew W. Kentz, Jordan C. Kahn, Nathaniel Maandig
Rickard, and Nathan W. Cunningham, Picard Kentz & Rowe LLP, of
Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice,
of Washington, DC, for the Defendant.  Also on the brief were
Stuart F. Delery, Assistant Attorney General, Jeanne E.
Davidson, Director, and Patricia M. McCarthy, Assistant
Director.  Of counsel on the brief was Melissa M. Brewer,
Attorney, Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington, DC.

**Pogue, Chief Judge:**  This action arises from the sixth

administrative review by the United States Department of

Commerce ("Commerce") of the antidumping duty order on certain

---

[1] This case was previously consolidated with Hilltop Int'l v.
United States, Ct. No. 12-00289, see Order Dec. 11, 2012,
ECF No. 18, but has subsequently been severed therefrom.
See Order Apr. 23, 2014, ECF No. 19.

frozen warmwater shrimp from the People's Republic of China

("PRC" or "China").[2]  Plaintiff Ad Hoc Shrimp Trade Action

Committee ("AHSTAC") – an association of domestic warmwater

shrimp producers that participated in this review[3] – challenges

Commerce's determinations to I) limit its examination to two

mandatory respondents; II) rely exclusively on certain entry

data obtained from United States Customs and Border Protection

("CBP") to make relative sales volume determinations when

selecting respondents for individual review; and III) use data

from a single surrogate country to value the labor factor of

production when calculating normal values.[4]

The court has jurisdiction pursuant to

Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[5] and 28 U.S.C.

---

[2] See Certain Frozen Warmwater Shrimp from the People's Republic of China, 77 Fed. Reg. 53,856 (Dep't Commerce Sept. 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ("Final Results") and accompanying Issues & Decision Mem., A-570-893, ARP 10-11 (Aug. 27, 2012) ("I & D Mem.").

[3] Compl., ECF No. 2, at ¶ 7.

[4] See Mem. of L. in Supp. of [AHSTAC]'s Mot. for J. on the Agency R., Ct. No. 12-00289, ECF No. 31 ("AHSTAC's Br.").  A public version of ASHTAC's (confidential) brief is available at ECF No. 32.

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

§ 1581(c) (2006).

As explained below, Commerce's determinations to limit its examination of respondents pursuant to 19 U.S.C. § 1677f-1(c)(2)(B); rely on Type 03 CBP data to make relative sales volume determinations when selecting respondents for individual examination; and value surrogate wage rates using data from the chosen primary surrogate country are each affirmed.

### STANDARD OF REVIEW

The court upholds Commerce's antidumping determinations if they are in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Where, as here, the antidumping statute does not directly address the question before the agency, the court will defer to Commerce's construction of its authority if it is reasonable. Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (relying on Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), and "can be translated roughly to mean 'is [the determination] unreasonable?'" Nippon Steel Corp. v. United

<u>States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted, alteration in the original).

## DISCUSSION

I.  <u>Commerce's Determination to Limit Individual Examination to Two Mandatory Respondents</u>

AHSTAC's challenge to Commerce's determination to limit its examination to two mandatory respondents, AHSTAC's Br. at 30-35, is rooted in Commerce's statutory obligation to "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise" when conducting administrative reviews of antidumping duty orders. 19 U.S.C. § 1677f-1(c)(1).  But the statute also permits Commerce to limit its examination if the review "involve[s]" a "large number of exporters or producers." <u>Id.</u> at § 1677f-1(c)(2) (the "large number exception").  Pursuant to the large number exception, Commerce may limit its examination to, *inter alia*, "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." <u>Id.</u> at § 1677f-1(c)(2)(B).[6]

---

[6] Those respondents who are not selected for individual examination and do not demonstrate eligibility for a separate rate are assigned the countrywide rate. <u>See</u> <u>Transcom, Inc. v. United States</u>, 294 F.3d 1371, 1373 (Fed. Cir. 2002) (discussing Commerce's practice of assigning to all exporters from non-market economy ("NME") countries like China a countrywide antidumping duty rate unless they affirmatively demonstrate

(footnote continued)

AHSTAC contends that Commerce improperly invoked the large number exception here because the number of exporters or producers "involved" in this review was not a "large number." AHSTAC's Br. at 32-35.  Although the review was initiated for 84 producers or exporters,[7] AHSTAC asserts that the number of respondents "involved" in the review should be determined based on CBP import data, which AHSTAC contends show that significantly fewer than 84 producers or exporters exported subject merchandise to the United States during the period of

---

eligibility for a "separate rate").  Those respondents who do demonstrate separate rate eligibility are assigned the "all others" rate. Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1374 (Fed. Cir. 2013) ("The separate rate for eligible non-mandatory respondents is generally calculated following the statutory method for determining the 'all others rate' under [19 U.S.C.] § 1673d(c)(5)(A).  As such, Commerce will typically use the weighted average of all mandatory respondents' rates, excluding any de minimis and AFA rates [i.e., rates calculated using adverse inferences employed based on a finding of failure to cooperate, see 19 U.S.C. § 1677e(b)]. If all dumping margins established are only de minimis or AFA rates, Commerce accordingly applies the exception found in § 1673d(c)(5)(B) [permitting Commerce to 'use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated'].") (additional citations omitted).

[7] Initiation of Antidumping Duty Administrative Reviews, Requests for Revocation in Part, and Deferral of Administrative Review, 76 Fed. Reg. 17,825, 17,827-28 (Dep't Commerce Mar. 31, 2011) ("Initiation Notice") (listing 84 companies as covered by the 2010-11 review of the antidumping duty order on certain frozen warmwater shrimp from the PRC).

review ("POR"). AHSTAC's Br. at 33-35.[8]  Commerce, on the other

hand, maintains that the number of producers or exporters

"involved" in the review is the number for which review was

initiated and not subsequently rescinded. See I & D Mem. cmt. 8

at 41.[9]

The first question before the court, therefore, is the

meaning of the phrase "involved in the . . . review." 19 U.S.C.

§ 1677f-1(c)(2).  Because the statute itself does not

unambiguously define this contested term,[10] Commerce's

construction is entitled to deference if it is reasonable.

See Chevron, 467 U.S. at 842-43.

Commerce submits that each producer or exporter for

whom review is initiated and not subsequently rescinded is

involved in the review. See I & D Mem. cmt. 8 at 41.  This

---

[8] See also id. at 18 ("The Type 03 CBP data that Commerce used to
select respondents [for individual examination] reflected [[ ]]
exporters of subject merchandise during the POR.").

[9] See also Def.'s Resp. in Opp'n to Pls.' Mots. for J. Upon the
Agency R., Ct. No. 12-00289, ECF No. 50 ("Def.'s Br.").
See supra note 1 regarding this action's prior consolidation
history.  A public version of Defendant's (confidential) brief
is available at ECF No. 51.

[10] See, e.g., Carpenter Tech. Corp. v. United States, 33 CIT
1721, 1727-28, 662 F. Supp. 2d 1337, 1342 (2009) (noting that
"Congress did not define the term 'large number of exporters or
producers involved in the . . . review,' as used in 19 U.S.C.
§ 1677f-1(c)(2)" and opining that "the term might be seen as
inherently ambiguous in some contexts").

construction is consistent with the statute's Statement of Administrative Action ("SAA"),[11] which affirms that § 1677f-1(c) codified Commerce's preexisting practice of "attempt[ing] to calculate individual dumping margins for all producers and exporters . . . *for whom an administrative review is requested*." H.R. Doc. 103-316, at 872 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4200 (emphasis added).  Thus the SAA supports Commerce's reading that the phrase "each known exporter and producer of the subject merchandise," to which the phrase "exporters or producers involved in the . . . review" refers, see 19 U.S.C. § 1677f-1(c), contemplates the entities for whom review was requested, initiated, and not rescinded, and does not require Commerce to first evaluate whether or to what extent those entities shipped subject merchandise during the POR.

AHSTAC essentially suggests that Commerce should have rescinded its review – and thus discharged its duty to assign dumping margins – with respect to all those respondents for whom review was requested and initiated but who AHSTAC maintains (based on its reading of the CBP data) had no exports of subject

---

[11] See 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

merchandise during the POR.[12]  But Commerce's consistent and judicially-affirmed practice has been that CBP data alone are insufficient to compel rescission based on a finding of no shipments.[13]

Indeed the procedure for rescinding a review based on a finding of no shipments reveals that all producers or exporters for whom review was initiated are "involved" in the review – demanding the use of Commerce's resources – until rescission is in effect.  As Commerce has previously stated:

> [P]rior to rescinding a review pursuant to 19 C.F.R.
> [§] 351.213(d)(3), [Commerce] must begin a factual
> examination and engage[] its resources to make [the]
> factual finding [as to whether or not the producers or

---

[12] See AHSTAC's Br. at 33-34; see also 19 C.F.R. § 351.213(d)(3) (permitting Commerce to rescind review of producers or exporters who had no exports, sales, or entries of subject merchandise during the POR).

[13] See, e.g., Fresh Garlic from the People's Republic of China, Issues & Decision Mem., A-570-831, ARP 07-08 (June 14, 2010) (adopted in 75 Fed. Reg. 34,976 (Dep't Commerce June 21, 2010) (final results and partial rescission of the 14th antidumping duty administrative review)) ("Garlic from China I & D Mem.") cmt. 2 at 8-9 ("CBP data is not sufficiently comprehensive to serve as a reliable basis for a conclusive determination that a particular producer or exporter made no shipments or entries of subject merchandise during the POR."); Hyosung Corp. v. United States, Slip Op. 11-34, 2011 WL 1882519, at *5 (CIT Mar. 31, 2011) ("Commerce is not obligated to rescind the review, but it may if it determines that a particular company did not have entries, exports, or sales.  . . .  [A]s Commerce explained, [however,] CBP data alone is not a conclusive statement of whether a respondent had shipments because it does not capture all entries, such as those not made electronically.") (emphasis in original).

exporters in question had shipments of subject merchandise during the POR].  In some cases, there is little controversy over the facts (i.e., the company has filed a timely no-shipment certification, the CBP data indicates no shipments, any response from CBP to [Commerce]'s no shipments inquiry does not contain any contrary evidence of possible shipments, and no other party presents other information).  In other cases, the evidence may be less clear and may require [Commerce] to issue supplemental questionnaires, do further research into CBP data, allow time for parties to comment and submit further information, and ultimately consider and weigh potentially conflicting data and, where necessary and appropriate, scheduling and conducting verification of the respondent's claims of no shipments.

Garlic from China I & D Mem. cmt. 2 at 7 (citation omitted).

Commerce's reading of the word "involved" in § 1677f-1(c) is

thus further supported by the agency's judicially-affirmed

practice of not rescinding reviews based on CBP data alone.[14]

        Accordingly, Commerce's reading of the statute – that

the number of exporters or producers "involved" in a review, as

contemplated by the exception contained in 19 U.S.C.

§ 1677f-1(c)(2), is the number for whom review was initiated and

not subsequently rescinded – is sustained as reasonable.[15]

---

[14] See *supra* note 13.

[15] AHSTAC also makes an argument rooted essentially in the doctrine of judicial estoppel. See ASHTAC's Br. at 33 ("Commerce released the CBP data at the outset of the review and consistently maintained that they accurately reflect import volumes during the POR.  Commerce should not be able to benefit from the administrative convenience afforded by these data while simultaneously using the number of respondents on which review has been requested as the relevant figure in evaluating whether

(footnote continued)

Here, the number of exporters or producers "involved" in the review at the time that Commerce invoked the large number exception – i.e., the number of exporters or producers for whom review was initiated and not rescinded – was 83.[16]  AHSTAC does not contest that 83 is a sufficiently large number to invoke the large number exception. See AHSTAC's Br. at 30-35 (arguing only that the number of respondents allegedly shown in the CBP data to have exported subject merchandise during the POR is not a large number).  Because 83 is, non-controversially, a large

---

to limit is examination.") (citations omitted).  It is true that, "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted).  But this is not such a case.  Commerce is not attempting to gain unfair advantage from inconsistent positions – its position that CBP data present reliable information regarding relative sales volumes is not inconsistent with its position that every exporter and producer for whom review is requested is involved in the review unless and until the review is specifically rescinded following the proper procedures therefor.

[16] See Initiation Notice, 76 Fed. Reg. at 17,827-28 (listing 84 companies as covered by the 2010-11 review of the antidumping duty order on certain frozen warmwater shrimp from the PRC); Certain Frozen Warmwater Shrimp form the People's Republic of China, 77 Fed. Reg. 12,801, 12,803 (Dep't Commerce Mar. 2, 2012) (preliminary results, partial rescission, extension of time limits for the final results, and intent to revoke, in part, of the sixth antidumping duty administrative review) ("Preliminary Results") (rescinding the review with respect to an entity that filed a "certification indicating that it did not export subject merchandise to the United States during the POR," regarding which Commerce's inquiry to CBP and request for comments from interested parties yielded no contrary information).

number, Commerce properly invoked § 1677f-1(c)(2) in this review.

II.  Commerce's Exclusive Reliance on Type 03 CBP Data to Make Relative Sales Volume Determinations

AHSTAC's next claim also proceeds from the statutory provision, noted above, that permits Commerce to limit its examination to, *inter alia*, "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined," if the number of respondents involved in an antidumping review is so large as to make individual examination of all respondents not practicable. 19 U.S.C. § 1677f-1(c)(2)(B).  Here, Commerce determined to limit its examination to the two largest exporters. I & D Mem. cmt. 8 at 40-41 (relying on 19 U.S.C. § 1677f-1(c)(2)(B)).  As Commerce explained, "the CBP data demonstrates that [the two chosen mandatory respondents] account for the overwhelming majority of the total reported quantity of imports of subject merchandise to the United States during the POR,"[17] and "it would be an unnecessary allocation of [Commerce]'s limited resources to individually examine the

---

[17] Id. at 41 (citing Certain Frozen Warmwater Shrimp from the [PRC], Resp't Selection Mem., A-570-893, ARP 10-11 (May 9, 2011) ("Resp't Selection Mem.") at Attach. 1, reproduced in App. of Docs. Supporting [Def.'s Br.] ("Def.'s App."), Ct. No. 12-00289, ECF No. 58-1, at Tab 5).

remaining quantity as it is extremely small."[18]  AHSTAC contends

that Commerce's determination regarding which respondents

exported the largest volume of subject merchandise during the

POR was not supported by substantial evidence. AHSTAC's Br.

at 19-30.

A.    *The Regal Discrepancy*

First, AHSTAC relies on a discrepancy between the

volume of sales reported for respondent Zhanjiang Regal

Integrated Marine Resources Company Limited ("Regal") in the CBP

data used to rank respondents' relative export volumes and the

data reported by Regal itself in response to Commerce's inquiry.

AHSTAC's Br. at 23; see also Def.'s Br. at 4 ("Commerce noted a

15 to 18 percent discrepancy between the volume of exports

reported for Regal in the Type 03 CBP data and the greater

volume of exports Regal reported in its questionnaire

responses.") (citation omitted).[19]  AHSTAC contends that this

---

[18] Id. (citing Torrington Co. v. United States, 68 F.3d 1347, 1351 (1995)).

[19] Entries are designated by the importer, under penalty of the law for fraud and/or negligence, 19 U.S.C. § 1592, with a two-digit code. See U.S. Customs & Border Prot., Dep't of Homeland Sec., CBP Form 7501 Instructions 1 (July 24, 2012), available at http://forms.cbp.gov/pdf/7501_instructions.pdf (last visited Apr. 28, 2014). "The first digit of the code identifies the general category of the entry (i.e., consumption = 0, informal = 1, warehouse = 2).  The second digit further defines the specific processing type within the entry category." Id.  Consumption entries covered by an antidumping duty order
(footnote continued)

discrepancy (the "Regal discrepancy") demonstrates that the CBP

data on which Commerce's relative sales volume determinations

were based are unreliable, and therefore provide insufficient

evidentiary support for Commerce's conclusion that the chosen

mandatory respondents accounted for the largest sales volumes of

subject merchandise relative to the remaining respondents.

See AHSTAC's Br. at 24.

        Commerce may base its § 1677f-1(c)(2)(B) relative

sales volume determinations on Type 03 CBP data[20] in the absence

of evidence indicating that such data are inaccurate or

otherwise unreliable. See Pakfood Pub. Co. v. United States,

---

must be designated as Type 03, whereas consumption entries that
are free and dutiable are designated as Type 01. Id.  AHSTAC
suggests that Type 03 CBP data were unreliable in this case
because some unknown portion of subject merchandise may have
been incorrectly entered as Type 01. See AHSTAC's Br. at 23-27.

[20] AHSTAC argues that Commerce should be required to also
consider and release to the parties under protective order
Type 01 data. See AHSTAC's Br. at 26-27; see generally
supra note 19.  But Type 01 data, whether alone or in
conjunction with Type 03 data, do not provide information that
could lead Commerce to easily identify any Type 01 entries as
subject merchandise. See Ad Hoc Shrimp Trade Action Comm. v.
United States, __ CIT __, 828 F. Supp. 2d 1345, 1355 (2012)
("The classification [as Type 01 or 03] itself does not yield
any specific information that would assist [Commerce] in
expeditiously determining whether merchandise should have been
reported as Type 03, or making any modifications to the Type 03
data for purposes of respondent selection.") (internal quotation
marks, citation, and footnote omitted).

__ CIT __, 753 F. Supp. 2d 1334, 1345-46 (2011).[21]  Where the record presents evidence that rebuts the presumption that CBP has assured the accuracy of such data, Commerce must account for such evidence when making its relative sales volume determinations. Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, 791 F. Supp. 2d 1327, 1333-34 (2011) (relying on Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.")).

---

[21] ("In the absence of evidence in the record that the CBP data – for merchandise entered during the relevant POR and subject to the [antidumping] duty order at issue – are in some way inaccurate or distortive, the agency reasonably concluded that such data, collected in the regular course of business under penalty of law for fraud and/or negligence, presents reliably accurate information.  Because Customs officers have a duty to assure the accuracy of information submitted to that agency by penalizing negligent or fraudulent omissions and/or inaccurate submissions, the presumption of regularity entails the reasonable conclusion that, in the absence of evidence to the contrary, the data obtained by Customs officials in their regular course of business is accurate.") (citing, inter alia, 19 C.F.R. § 162.77(a) ("If the [appropriate Customs] Officer has reasonable cause to believe that a violation of [19 U.S.C. § 1592 (prohibiting fraudulent and/or negligent submission and/or omission of material information to Customs)] has occurred ... he shall issue to the person concerned a notice of his intent to issue a claim for a monetary penalty."); Seneca Grape Juice Corp. v. United States, 71 Cust. Ct. 131, 142, 367 F. Supp. 1396, 1404 (1973) (noting "the general presumption of regularity that attaches to all administrative action," namely that "[i]n the absence of clear evidence to the contrary, the courts presume that public officers have properly discharged their duties.  . . . [and] [t]his presumption, of course, also attaches to the official actions taken by customs officers") (additional citations omitted).

Here, Commerce acknowledged the Regal discrepancy but determined that this discrepancy did not impugn the accuracy of the *relative* (rather than exact) volumes of subject entries attributable to the respective respondents subject to this review. See I & D Mem. cmt. 8 at 42-45; see also Def.'s Br. at 17-18 ("Commerce reasonably explained in the final results that it does not require Type 03 CBP data to be flawless or free from discrepancies in order for it to be a reliable source for the limited purpose of identifying the largest exporters and producers during respondent selection.") (citing I & D Mem. cmt. 8 at 42-43). The question before the court, therefore, is whether it was reasonable for the agency to conclude that Regal was one of the largest exporters/producers of subject merchandise during the POR, notwithstanding the Regal discrepancy.

Commerce's conclusion that Regal was one of the largest exporters/producers of subject merchandise during the POR, regardless of the 15-18 percent discrepancy between the sales reported in CBP data and those reported by Regal in response to Commerce's questionnaire, is reasonably supported by the evidence on record. See I & D Mem. cmt. 8 at 42-43 ("The [CBP] data are not used to *definitively* determine any particular respondent's actual quantity of subject merchandise shipped during the POR . . . [but rather are used solely as] a

reasonably accurate reflection of the relative position of the exporters under review") (emphasis in original); id. at 44 ("[T]he discrepancy between the CBP data and Regal's sales quantity would not have precluded [Commerce] from selecting Regal [as one of the largest exporters/producers of subject merchandise during the POR] . . . ."). Specifically, the record reveals that the magnitude of the Regal discrepancy is far outweighed by the magnitude of Regal's POR sales (with or without accounting for the discrepancy) relative to the remaining respondents.[22] From this it is reasonable to conclude that the Regal discrepancy did not impugn the accuracy of Commerce's finding that Regal was one of the largest exporters/producers of subject merchandise during the POR. See I & D Mem. cmt. 8 at 44.

   *B. Transshipment Allegations*

   AHSTAC also argues that the "indicia of transshipment" on this record "provide further 'new evidence'" that the CBP data used to determine respondents' relative POR sales volumes were unreliable for this purpose. AHSTAC's Br. at 27-28. Specifically, AHSTAC contends that "[t]he documented

---

[22] See Def.'s Br. at 4 ("If included in the CBP data, the discrepancy would have increased even further Regal's more than [[      ]] times greater volume of exports compared to those of the next largest exporter.") (citing Resp't Selection Mem. at Attach. 1).

transshipment through Cambodia to evade the [antidumping duty] order on shrimp from China rebuts the presumption of reliability ordinarily attaching to CBP data." Id. at 28.

But notwithstanding AHSTAC's characterization of the record, the evidence does not indisputably "document[] transshipment through Cambodia" during the POR.  On the contrary, no imports of shrimp from Cambodia (potentially transshipped or otherwise) during the POR are documented on the record of this review.[23]  "In the absence of evidence in the record that the CBP data – *for merchandise entered during the relevant POR* and subject to the [antidumping] duty order at issue – are in some way inaccurate or distortive, [Commerce may] reasonably conclude[] that such data . . . present reliably accurate information." Pakfood, __ CIT at __, 753 F. Supp. 2d at 1345.  AHSTAC has not pointed to any record evidence that the CBP data for subject merchandise entered during this POR incorrectly reported any portion of the volume of merchandise imported from China as originating in Cambodia. See AHSTAC's Br.

----

[23] See Certain Frozen Warmwater Shrimp from the [PRC], Customs Data of U.S. Imports of Certain Frozen Warmwater Shrimp from Cambodia, A-570-893, ARP 10-11 (May 17, 2012) at Attach. I, reproduced in Def.'s App., Ct. No. 12-00289, ECF No. 58-6, at Tab 32 (showing no imports of shrimp from Cambodia during the POR); see also Final Results, 77 Fed. Reg. at 53,856 (noting that the relevant POR was February 1, 2010, through January 31, 2011).

at 27-28.  Accordingly, AHSTAC's transshipment allegations are also insufficient to impugn the accuracy of the CBP data used to determine respondents' relative sales volumes in this review.

Commerce "enjoy[s] broad discretion in allocating [its] investigative and enforcement resources," Torrington, 68 F.3d at 1351, and the agency's finding that the two chosen mandatory respondents accounted for the "overwhelming majority of the total reported quantity of imports of subject merchandise to the United States during the POR," I & D Mem. cmt. 8 at 41, is supported by a reasonable reading of the record.[24]  No further showing is required.  See 19 U.S.C. § 1677f-1(c)(2).  Accordingly, Commerce's application of § 1677f-1(c)(2)(B) in this case is sustained.

## III. Commerce's Calculation of Surrogate Labor Rates

### A. Background

Because Commerce treats China as a non-market economy ("NME") country, Commerce determines the normal value of merchandise from China by using surrogate market economy data to calculate production costs and profit.  See 19 U.S.C. § 1677b(c)(1).  In doing so, Commerce's valuation of the factors of production ("FOPs") must be "based on the best available

---

[24] See Resp't Selection Mem. at Attach. 1; see also *supra* note 17 and accompanying text.

information regarding the values of such factors in a market economy country or countries considered to be appropriate by the [agency]." Id.  "[T]o the extent possible," Commerce is required to use data from countries that are both economically comparable to the NME and significant producers of comparable merchandise. Id. at § 1677b(c)(4).

In the past, Commerce generally valued the labor FOP for NME countries by using "regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries." 19 C.F.R. § 351.408(c)(3) (2010).  Regression-based NME wage rates estimated the linear relationship between yearly per capita gross national income ("GNI") and hourly wage rate ("wage") to arrive at the wage for an NME country by using the NME's GNI.[25] But 19 C.F.R. § 351.408(c)(3) was invalidated as contrary to the statute because, rather than evaluating the extent to which it was possible to base surrogate FOP calculations on data from countries that are economically comparable to the NME and significant producers of comparable merchandise, the regulation

---

[25] Zhejiang DunAn Hetian Metal Co. v. United States, __ CIT __, 707 F. Supp. 2d 1355, 1366 (2010) (footnote omitted), vacated on other grounds, 652 F.3d 1333 (Fed. Cir. 2011); see also Dorbest Ltd. v. United States, 604 F.3d 1363, 1371 (Fed. Cir. 2010) ("Commerce determines a linear trend that best fits the data, providing a way to predict the labor rate for a country with any given gross national income.").

instead formulaically required reliance on data from countries that did not satisfy one or both of these statutory requirements.[26]

In response to Dorbest and Shandong, Commerce reconsidered its approach to surrogate labor valuation, including an opportunity for public comment.  The agency then published its New Labor Rate Policy, explaining its change in policy from a preference for using data from multiple market economies when constructing surrogate labor rates to a policy of relying on data from a single market economy to calculate all surrogate FOPs, including labor.[27]  For its final results of this review, Commerce employed the New Labor Rate Policy to arrive at the surrogate wage rate used to construct normal value,

---

[26] See Dorbest, 604 F.3d at 1371-72 (holding that because the statute requires Commerce to use data from economically comparable countries "to the extent possible," Commerce may not employ a methodology that requires using data from both economically comparable and economically dissimilar countries, in the absence of a showing "that using the data Congress has directed Commerce to use is impossible"); Shandong Rongxin Imp. & Exp. Co. v. United States, __ CIT __, 774 F. Supp. 2d 1307, 1316 (2011) (holding that because the statute requires Commerce to use, "to the extent possible," data from countries that are "significant" producers of comparable merchandise, Commerce may not employ a methodology that requires using data from "countries which almost certainly have no domestic production – at least not any meaningful production, capable of having influence or effect").

[27] Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) ("New Labor Rate Policy").

see I & D Mem. cmt. 11 at 51-52, which AHSTAC now challenges.
See AHSTAC's Br. at 38-41.

Significantly, AHSTAC also challenged Commerce's
application of its New Labor Rate Policy in the fifth
administrative review of an antidumping duty order on certain
frozen warmwater shrimp from the Socialist Republic of Vietnam.[28]
In adjudicating that challenge, this Court sustained the New
Labor Rate Policy as reasonable on its face, holding that
"Commerce reasonably determined that, in general, the
administrative costs of engaging in a complex and lengthy
analysis of additional surrogate data for the labor FOP may
outweigh the accuracy-enhancing benefits of doing so."[29]  But
because the particular evidentiary record of that proceeding
included specific evidence that could fairly be read to detract
from Commerce's conclusion that its chosen primary surrogate
country provided the best available information regarding all
relevant FOPs (including labor), Commerce's application of its
New Labor Rate Policy in that proceeding was remanded for
Commerce to "to weigh and analyze the conflicting evidence and

---

[28] See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, __ CIT __, 880 F. Supp. 2d 1348 (2012) ("Camau I").

[29] Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, __ CIT __, 968 F. Supp. 2d 1328, 1336 (2014) ("Camau III") (citing Camau I, __ CIT __, 880 F. Supp. 2d at 1358).

provide a reasoned explanation for the outcome of such

weighing."[30]

   *B. Analysis*

       AHSTAC argues that Commerce's application of its <u>New

Labor Rate Policy</u> when calculating surrogate labor FOP values in

this review should be remanded on the same grounds as in <u>Camau</u>.

<u>See</u> AHSTAC's Br. at 39, 41.  But AHSTAC mischaracterizes the

holdings in <u>Camau</u>.[31]

       Generally, there is nothing inherently unreasonable in

Commerce's decision to value all surrogate FOPs (including

labor) using relevant data from a single surrogate country.

<u>Camau I</u>, __ CIT at __, 880 F. Supp. 2d at 1358; <u>Camau III</u>,

__ CIT at __, 968 F. Supp. 2d at 1336.  The necessity for remand

in <u>Camau</u> arose from the presence of specific record evidence –

stemming from the actual GNI disparity between the chosen

surrogate and the exporting NME – that fairly detracted from the

_____

[30] <u>Id.</u>

[31] For example, AHSTAC contends that Commerce's determination in
the proceeding at issue in <u>Camau</u> was remanded to address prior
findings regarding "wage rate variability." AHSTAC Br. at 39.
But in fact the court upheld Commerce's <u>New Labor Rate Policy</u>,
which implements the agency's conclusion that the accuracy-
enhancing benefits of addressing wage rate variability among
economically comparable potential surrogates are generally
outweighed by the administrative costs of engaging in a complex
and lengthy analysis (as necessary to satisfy the statutory
criteria) of surrogate labor data from more than one country.
<u>See</u> <u>Camau I</u>, __ CIT __, 880 F. Supp. 2d at 1358;
<u>see also</u> <u>Camau III</u>, __ CIT at __, 968 F. Supp. 2d at 1336.

reasonableness of Commerce's data-set selection. See Camau III,

__ CIT at __, 968 F. Supp. 2d at 1336.[32]

        Here, by contrast, AHSTAC does not point to any record

evidence specific to this review.  AHSTAC does not suggest that

the particular GNI difference between Thailand and China makes

the use of Thai labor data unreasonable for the purpose of

estimating fair market labor rates in China.  AHSTAC makes no

mention of any specific GNI values at all. See AHSTAC's Br.

at 38-41.  Instead, its challenge to Commerce's reliance on the

New Labor Rate Policy in this review is essentially a challenge

---

[32] The concern in Camau was that Commerce had initially chosen
Bangladesh as the primary surrogate for Vietnam *without
considering* the reasonableness of using Bangladeshi wage data as
a surrogate for Vietnam's labor rate (because Bangladesh was
chosen as the primary surrogate in that review at a time when
Commerce's policy was to use multiple countries' data to
calculate surrogate labor FOP values, before the New Labor Rate
Policy went into effect).  Indeed Commerce had even previously
specifically rejected the use of Bangladeshi wage data for this
purpose, based on the discrepancy in GNI between Bangladesh and
Vietnam. See Camau III, __ CIT at __, 968 F. Supp. 2d at 1332.
Then, applying the New Labor Rate Policy (which went into effect
in the interim between the preliminary and final results of the
proceeding at issue in Camau), Commerce did not in any way
reevaluate whether Bangladesh was still the best potential
surrogate from which to value *all* FOPs, including labor.  On the
contrary, Commerce did not even acknowledge that the record
contained conflicting evidence and findings in this regard,
including the agency's own prior finding that, due to the
particular GNI disparity between Bangladesh and Vietnam,
Bangladeshi wage data are likely to significantly understate the
estimated wage rate for Vietnam (given the generally linear
relationship between GNI and wage). See id. at 1334, 1336-38.

to the new policy generally, without regard to the specific evidence on this record. See id.

Specifically, AHSTAC argues that Commerce's reliance on its New Labor Rate Policy in this review should be remanded to account for Commerce's prior findings of a general correlation between wage rate and GNI and the consequent wage rate variability among countries with GNIs that Commerce treats as economically comparable. See id. at 39. But these are findings of a general nature, whose impact was already considered and weighed by Commerce in the context of reasoning through its New Labor Rate Policy.[33] In Camau, it was additionally argued that the record evidence indicated that the specific GNI difference between Bangladesh and Vietnam was sufficiently great as to significantly understate the estimated labor FOP, a factor which Commerce had failed to consider and weigh against the remaining evidence suggesting that Bangladesh's data as a whole were the best available on record from which to value all of the surrogate FOPs, all things considered.[34]

---

[33] See New Labor Rate Policy, 76 Fed. Reg. at 36,093; Camau III, __ CIT at __, 968 F. Supp. 2d at 1336.

[34] Thus the remand in Camau was so that Commerce may explicitly engage in such weighing of the specific evidence on the record of that proceeding, *not* because Commerce was required to reevaluate the *general* conclusions underlying its new policy

(footnote continued)

Because AHSTAC makes no arguments specific to the evidence on the record of this review, its challenge is essentially a renewed facial challenge to Commerce's New Labor Rate Policy. See AHSTAC's Br. at 39-41. But as AHSTAC presents no new arguments in this respect, the reasonableness of Commerce's New Labor Rate Policy is sustained on the same grounds as stated in Camau I and Camau III. See Camau I, __ CIT at __, 880 F. Supp. 2d at 1358; Camau III, __ CIT at __, 968 F. Supp. 2d at 1336.

## CONCLUSION

For all of the foregoing reasons, Commerce's Final Results are sustained against the challenges presented in this action. Judgment will issue accordingly.

___/s/ Donald C. Pogue_____
Donald C. Pogue, Chief Judge

Dated: May 27, 2014
      New York, NY

---

(which include the conclusion that "in general, the administrative costs of engaging in a complex and lengthy analysis of additional surrogate data for the labor FOP may outweigh the accuracy-enhancing benefits of doing so"). Camau III, __ CIT at __, 968 F. Supp. 2d at 1336.